# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-12-00314-CV

**Dr. Saung Zin Park, Appellant**

**v.**

**Escalera Ranch Owners' Association, Inc. and Rostrata Builders, Inc., Appellees**

**FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 277TH JUDICIAL DISTRICT
NO. 09-1127-C277, HONORABLE KEN ANDERSON, JUDGE PRESIDING**

## O P I N I O N

This appeal arises from a suit by Escalera Ranch Owners' Association, Inc. to enforce its restrictive covenants. Dr. Saung Zin Park appeals from the trial court's final judgment awarding injunctive relief to the Association, awarding the Association attorneys' fees, and dismissing Park's claims against Rostrata Builders, Inc. with prejudice. In its suit, the Association alleged that Park installed windows in his house that differ from the windows that he had agreed to install and that the Association's design committee had approved after Park submitted his construction plans, as required by the restrictive covenants governing Park's use of the property. Park filed a third-party complaint against Rostrata Builders, asserting breach of his construction contract with Rostrata. After Rostrata filed special exceptions, the trial court dismissed Park's claims with prejudice. After a two-day bench trial on the remaining claims, the trial court ruled in the Association's favor and denied Park's counterclaims.

Many of Park's issues on appeal concern the Association's failure to provide him with statutorily required presuit notice of his right to request a hearing before the Association to discuss the violation. Park asserts that the failure to provide presuit notice as required by the Property Code deprived the trial court of jurisdiction, which is a matter of first impression. We conclude that the notice requirement is mandatory, but not jurisdictional. We also conclude that Park has not shown reversible error based on the Association's failure to provide presuit notice. In addition to this jurisdictional issue, Park raises other issues, including whether the Association performed all conditions precedent to suit, whether he should have prevailed on his breach-of-contract counterclaim against the Association and been awarded attorneys' fees, whether he substantially breached the restrictive covenants by installing windows that did not conform to the approved plans, whether the parties' agreement about the type of windows to be installed in his house was ambiguous, whether the Association's conduct supported Park's affirmative defenses, whether the Association's decision to sue him was arbitrary and capricious, and whether the equities supporting the injunctive relief weigh in the Association's favor. For the reasons discussed below, we conclude that the trial court did not err by granting the injunctive relief requiring Park to install windows that comply with the approved plans and will affirm the portion of the judgment in favor of the Association.

Park also appeals the trial court's dismissal with prejudice of his third-party claims against Rostrata. Although the trial court did not abuse its discretion by granting Rostrata's special exceptions, the court should have granted Park leave to amend his complaint. Consequently, we will reverse the portion of the judgment dismissing the claims with prejudice and will remand to the trial court to allow Park to replead to cure the defects in the complaint.

2

**FACTUAL BACKGROUND**

Park purchased a lot in the Escalera Ranch subdivision in Williamson County on which he built a new home. His property, like the other lots in the subdivision, is subject to the Amended Declaration of Covenants, Conditions, Easements and Restrictions of Planned Unit Development of Escalera Ranch. The Declaration was recorded in the real property records of Williamson County at the time Park purchased the property.

The Declaration established the Escalera Ranch Owners' Association to administer and enforce the provisions of the Declaration, including covenants and restrictions related to all construction in the subdivision. Each property owner in the subdivision is a member of the Association. The Declaration also established a Master Design Committee, which created Master Design Guidelines "to create a harmonious residential community." Before any construction (either new or an exterior addition or change) can begin on any lot in the subdivision, the Declaration purports to require that detailed plans and specifications must be submitted to the Master Design Committee, which is "the sole authority for determining whether proposed structures [and] landscape elements . . . are in harmony of design with other existing structures and the overall development plan for the Subdivision" and for approving plans.

The Declaration states that:

> The Master Design Committee shall have the express authority to perform fact finding functions hereunder and shall have the power to construe and interpret any covenant herein that may be vague, indefinite, uncertain or capable of more than one interpretation. The goal of the Committee is to encourage the construction of dwellings of architectural design, quality and size compatible with Declarant's conceptual plan for the Subdivision. Dwellings should be planned and designed with particular attention to the design and aesthetic appearance of the exterior and the use of such materials, which in the sole judgement [sic] of the Committee, create

3

an attractive and harmonious blend with existing and proposed dwellings in the immediate area and the natural surroundings. *The Committee may disapprove the construction or design of a home on purely aesthetic grounds, when, in its sole judgement [sic], such disapproval is required to protect the continuity of design or values of the neighborhood* or to preserve the serenity and natural beauty of the surroundings.

(Emphasis added.) In addition, the Declaration states that "[a]ll decisions of the Master Design Committee shall be final and binding" and that "[t]here shall be no review of any action of the Committee except by procedures for injunctive relief when such action is patently arbitrary and capricious." The Declaration further provides that any owner, the Association, the Declarant, or the Committee may seek to enjoin construction or threatened construction in violation of the Declaration or may seek other relief, provided that the offending owner or builder is first given "written notice of the perceived violation and the opportunity to remedy the violation prior to the filing of suit."

A copy of the Master Design Guidelines were provided to Park when he purchased his lot. The Guidelines (a 45-page document) state that the objectives of the Escalera Ranch planning process include "the subtle blending of the built environment into a harmonious and aesthetically pleasing community" with the "unifying visual theme" of preservation of the natural environment. The Guidelines set forth site-development guidelines, architectural-design guidelines, landscape guidelines (with an approved plant list attached to the Guidelines), and construction guidelines. Each of these sections discusses design features and includes detailed requirements for many of these features, including driveways, fencing, exterior lighting, building height, minimum square footage, exterior colors, roof pitch and materials, exterior-surface building materials, and landscaping.

4

The Guidelines also elaborate on the review and approval processes that were provided for in the Declaration. The design-review process is divided into five phases:

(1)    a pre-design meeting with the owner and/or his architect;

(2)    the preliminary submission of drawings, including a site plan, roof plan, floor plans, and exterior elevations of all sides of the residence, followed by a review-and-comment period for other owners in the subdivision and a written response from the Master Design Committee to the owner approving, approving with stipulations, or disapproving the preliminary submission;

(3)    the final submission (after preliminary approval is obtained) of complete construction documents including all data required for preliminary approval, as well as additional samples of exterior building materials, a complete landscape plan and other details related to the construction project, again followed by a written response from the Master Design Committee to the owner approving, approving with stipulations, or disapproving the final submission;

(4)    the construction process, during which time the Master Design Committee may inspect all work in progress and give notice of noncompliance if found; and

(5)    final inspection by the Master Design Committee within a set time after it receives written notice of construction completion, with a set time for notifying the owner in writing of any noncompliance.

The Guidelines specifically state that "[a]ny exterior changes to the approved drawings before, during, or after the construction of an improvement must first be submitted for approval by the Master Design Committee."

Park submitted his preliminary plans in December 2008 or early January 2009. Park's architect met with the Master Design Committee in early January. After the meeting, the architect corresponded with the Committee by e-mail and asked for a written summary of the

5

revisions that the Committee had requested at the meeting. The Committee responded with the following list:

1) Predominantly hip roofs, front, left and right elevations
2) High percentage of arched windows dominate the front elevation
3) The rounded entry feature does not conform to Escalera Ranch styles
4) *Maintain 50/50 windows on right left and front elevations*
5) Chimney capped with metal bonnet as required.

(Emphasis added.) After receiving a copy of the list, Park replied by e-mail, "I think we can easily adopt the suggestions the committee ha[s] with #4 and #5," although he had "significant issues with #1, #2 and #3."

The Master Design Committee wrote a letter to Park the following week to inform him that it disapproved his plans, primarily because the rounded design of the front entry gave the house "too much of a 'castle' like appearance," which the Committee deemed inconsistent with the aesthetic concept of the subdivision and the overall philosophy of the Master Design Guidelines. In its letter, the Committee stated, "You and the MDC have agreed to use are [sic] the 50/50 window system *with vertical divides only*. The MDC has approved arched windows and transoms, assuming that they will also have *vertical divides only*." (Emphasis added.)

In April, the Master Design Committee issued amended Master Design Guidelines, which incorporated additional technical specifications or design guidance for several different aspects of construction, including driveways, address identification, mailboxes, utility service, chimney caps, and window design. The original version of the Guidelines had not contained technical design specifications for windows; however, that version required window specifications to be provided to the Committee as part of the final-submission documentation. The amended

6

Guidelines added to the original guidance about skylights and windows that "[w]indows visible from street or neighboring lots must be 50/50 sash and 2 over 2 vertical panes. Headers or transoms should follow the vertical style of the windows."

The Association contends that a window that is "fifty-fifty" in proportion with two-over-two vertical panes is divided in four equal sections with the center rails between the two sashes forming the horizontal divide in the middle of the window and a single vertical divide running down the middle of the window. Park, on the other hand, contends that this phrase is ambiguous.

Park submitted revised plans in early June. The Association asserts that his revised plans differed from his original plans in several ways, including several changes to windows. On the right side of the house (referred to as the "right elevation" on the plans), the original plans show two groups of two large windows and two other individual windows that are sixty-forty in proportion, rather than fifty-fifty in proportion and that have no vertical divides in the individual windows (i.e., the windows were one-over-one pane instead of two-over-two panes). There are also two groups of smaller windows that appear to be fifty-fifty in proportion, but have six-over-six panes. On the revised plans, there is only one group of large windows, and they are fifty-fifty in proportion with two-over-two panes. The two groups of smaller six-over-six windows appear on the revised plans as three small windows that are fifty-fifty in proportion with two-over-two panes. Similarly, one window on the left elevation in the original plans was fifty-fifty in proportion, but did not have vertical divides. On the revised plans, the window was shown with a vertical divide creating two-over-two panes. In other words, the windows on the revised plans conform to the parties' agreement in January that Park would use "the 50/50 window system with vertical divides only" and that arched windows and transoms also have vertical divides only. The windows on the

7

revised plans also conform to the amended Guidelines' requirement that "[w]indows visible from street or neighboring lots must be 50/50 sash and 2 over 2 vertical panes. Headers or transoms should follow the vertical style of the windows."[1] Although the windows on the revised plans vary in size, schematically they look like this:[2]



Park's final submission to the Master Design Committee also included a form titled "ESCALERA RANCH PLAN APPROVAL CHECKLIST." The form identifies the lot by legal description and has sections for "<u>EXTERIOR MATERIAL SUBMITTALS REQUIRED</u>" and "<u>PLAN SUBMITTALS REQUIRED</u>." There are blanks in each section for information about many of the details involved in the construction project. In the "<u>EXTERIOR MATERIAL SUBMITTALS</u>

---

[1] The Master Design Committee did not require Park to change the windows on the rear elevation of his house to conform to the fifty-fifty proportion with two-over-two panes because those window are not visible from the street.

[2] Although not identical in detail or size, this rendering is substantially similar in schematic form to the drawings of the windows in the approved plans admitted as an exhibit at trial and is provided for illustrative purposes.

REQUIRED" section, there is a blank for "Windows - Material & Color." Under the blank, the form states: "(Front and sides must be 50/50 Sash Divide, 2/2 Paned)." In the blank, a handwritten note states: "JELDWEN SITELINE EX." At the bottom of the form, above the signature lines, a representation in bold states "THE FOREGOING ACCURATELY REPRESENTS WHAT HAS BEEN SUBMITTED ON THE PLANS FOR ARCHITECTURAL CONTROL COMMITTEE APPROVAL." The form is signed by Park, his builder, and his architect.

The Committee approved Park's revised plans, and construction began on the home. However, instead of windows that are fifty-fifty in proportion with two-over-two panes (i.e., four equal sections with a vertical divide down the center and a horizontal rail where the window sashes meet), the installed windows at issue have horizontal divides creating windows with more panes than those on the approved revised plans. For example, instead of two panes over two panes, some windows have three vertical sections of panes with one horizontal divide each in the top and bottom halves of the window, making the window have six-over-six panes. The installed windows vary in size, but schematically they look like this:[3]



---

[3] Although not identical in size or detail, this rendering is substantially similar in schematic form to the drawing included by Park in his brief as representative of the installed windows and is provided for illustrative purposes.

At trial, Park acknowledged that the installed windows are different from the windows shown on the approved revised plans. He also testified that he did not submit new drawings to the Master Design Committee for approval of the windows that differed from the approved windows.

The Association Board and the Master Design Committee notified Park by e-mail on September 28, 2009, of their position that the installed windows did not comply with the approved plans and asked him to address the asserted violation as soon as possible. In a follow-up e-mail on September 30, 2009, a Committee member responded to Park's "verbally petition[ing]" another Committee member for a waiver of the requirement, explaining that the Committee could not grant a waiver because it might later be considered unreasonable for the Committee to enforce the requirement on future homeowners. The Committee member asserted that more than half of the subdivision had already been built out and all other homes were in compliance with the window-design requirement. Park responded by e-mail, asserting that his windows were in compliance because they had "two sashes that open vertically rather than 50/50 that is horizontally divided that opens side to side." He further stated that if the Committee did not immediately withdraw any prohibition from construction progression, he intended to "pursue all judicial relief in most vigorous manner and will seek all renumeration [sic] for any injurious act committed by any individual members of the [Committee]."

The Association's attorney sent a letter to Park on October 2, 2009, and elaborated on the Committee and the Association's position that the windows did not comply with the Committee's requirements for approval of his construction. The letter demanded that Park "provide the [Committee] your assurances in writing that the windows in question will be made to conform to the [Committee's] requirements and to the plans which were approved for the Property" within

10

two working days from the date of the letter. The attorney added that "[f]ailure to do so could result in the Association taking adverse action against you, including but not limited to filing a lawsuit against you to enforce the Declaration . . . ." The letter did not, however, provide Park with statutorily required notice that he "may request a hearing under Section 209.007 on or before the 30th day after the date the owner receives the notice" of violation of the property owners' association's restrictions. *See* Tex. Prop. Code § 209.006 (requiring association to provide notice to owner of owner's right to hearing before suing owner); *see also id.* § 209.007 (providing that owner who is entitled to opportunity to cure violation "has the right to submit a written request for a hearing to discuss and verify facts and resolve the matter in issue" before board-appointed committee or before board of association).

Park did not provide the "assurances" that the Association's attorney had demanded, and Park testified at trial that he never requested any additional time to provide assurances to the Committee. Instead, he offered to pay the Association $5,000 if the Master Design Committee would allow him to keep in place the installed unapproved windows. The Committee rejected this offer. Travis Williams, a Committee member who testified at trial, stated that the Committee rejected this offer because, as the Committee saw it, the offer would not have corrected the problem and would have undermined the Committee's ability to enforce approved plans in the future and also because the Committee was concerned that it might appear to be a "bribe" in exchange for a waiver. He further testified that the Committee's objective was not to assess a fine or reach a settlement for a violation but instead to achieve compliance with the Declaration and Master Design Guidelines—"to correct a problem." Williams also testified that Park never indicated that he would install windows that complied with the approved plans; instead, his "responses consisted of denial that he would

11

make any changes and accusations of our misconduct, discrimination and other bad things. We had zero indication from Dr. Park that he was willing to consider anything other than pursuing legal action against us."

Coe Pratt, the Rostrata Builders' co-owner and representative who testified at trial, explained that Rostrata attempted to resolve the window issue with Park soon after the Committee notified him and Park of the alleged violation (before the Association sued Park). Pratt estimated that it would cost approximately $15,000 to replace the noncompliant windows, and Rostrata offered to evenly split the cost with Park, so that Park would only have to pay $7,500 to replace the windows. According to Pratt, although Pratt thought at one point he and Park had a verbal agreement to proceed in this way, Park backed out of the agreement around the time that he proposed the $5,000 payment to the Association.

In response to an October 8 letter from Park (which is not included in the record), the Association's attorney sent another letter to Park on October 14 asserting "that the [Committee] and the Association have no alternative but to demand that your home come into compliance with the window configuration requirement as has been clearly communicated to you. The [Committee] has made a final and binding decision pursuant to the terms and provisions of the Declaration." The Association further demanded that Park "remove the currently installed windows and commence installation of the approved window configuration" within two working days from the letter's date, adding that failure to do so would result in adverse action by the Association against him, including filing suit to enforce the Declaration. Like the October 2 letter, this letter omitted the statutorily required notice of Park's right to request a hearing before the Committee or the Board. Park testified

at trial that he never responded to the letter by requesting an extension of additional time beyond the two-day limit provided in the letter.

## PROCEDURAL BACKGROUND

The Association sued Park on October 30, 2009, a little more than a month after the Committee had first notified Park and Pratt that the windows did not comply with the approved plans. The Association asserted in its petition that Park had breached the restrictive covenants in the Declaration and sought a mandatory injunction requiring Park to remove the noncompliant windows and install windows that complied with the plans approved by the Committee. The Association also sought statutory damages under Section 202.004 of the Property Code and attorneys' fees under Section 5.006 of the Property Code. *See id.* §§ 202.004(c) (allowing trial court to assess civil damages for violation of restrictive covenant in amount not to exceed $200 for each day of violation), 5.006 (providing that "the court shall allow to a prevailing party who asserted the action reasonable attorney's fees in addition to the party's costs and claim" in action based on breach of restrictive covenant).

Park answered pro se, and in addition to filing a general denial, he asserted as an affirmative defense that the Guidelines are ambiguous and thus unenforceable. He also asserted counterclaims against the Association for "breach of contract" (based on the Association's failure to seek alternative dispute resolution before filing suit), "violation of owner's due process" (based on the Association's failure to provide the notice and hearing required under Property Code Sections 209.006 and 209.007), and "racial and ethnic discrimination." Park sought damages in excess of $1 million. After retaining an attorney, Park filed a supplemental answer in which he asserted the

13

affirmative defense of unclean hands and a counterclaim for breach of the duty of good faith and fair dealing. Based on these theories, Park sought noneconomic and general damages in the amount of $20,000, plus economic damages, including but not limited to deposition and mediation costs. He also sought attorneys' fees under Property Code Section 5.006.

Before a mediation that was scheduled for October 29, 2010, the Association sent Park a letter on September 22, 2010—almost a year after filing suit—attempting to cure its failure to provide Park with presuit notice of his right to request a hearing before the Board by informing him that he had a right to request a hearing before the Board on or before the 30th day after the date of the letter. *See id.* § 209.007. In addition, the Association again requested that Park remove the noncompliant windows before the mediation as a means of resolving the dispute. Park did not request a hearing after receiving the letter or remove the windows, and the case did not settle at mediation.

Almost a year later, Park filed a third-party complaint in which he asserted a breach-of-contract claim against Rostrata Builders, essentially seeking contribution if the Association recovered against him "for all such costs since the breach of construction contract is the sole cause of [the Association's] request for injunctive relief." Rostrata answered and asserted affirmative defenses, including that the complaint was time-barred under local rules. In addition, Rostrata filed special exceptions, asserting that Park's complaint failed to state a viable cause of action because Texas does not recognize a cause of action for contribution arising out of a breach-of-contract claim, according to Rostrata. After a hearing, the trial court entered an order sustaining the special exceptions and dismissing Park's claims against Rostrata with prejudice.

14

About a month later, the case between the Association and Park went to trial. After a two-day bench trial, the trial court ruled in favor of the Association and against Park. The trial court granted the Association's request for injunctive relief and denied relief on all of Park's counterclaims. The trial court denied the Association's request for statutory damages under Property Code Section 202.004 but granted the Association's request for attorneys' fees. The court, however, only awarded attorneys' fees incurred from October 25, 2010, a date corresponding to what would have been the deadline for Park to request a hearing if the Association's September 22, 2010 notice letter had invoked Property Code Section 209.007. *See* Tex. Prop. Code § 209.008(b) (establishing that owner is not liable for attorneys' fees incurred by property owners' association related to matter described by notice of hearing if attorneys' fees are incurred before conclusion of hearing or before date by which owner must request hearing, if no hearing is requested).

The trial court's final judgment requires Park to install windows and transoms on the exterior of his house "in conformance with those in his plans and specifications approved by [the Association's] Master Design Committee and which are depicted in [the Association's] Trial Exhibit 11" within 60 days from the date of the judgment or the date the judgment becomes final and unappealable, whichever is later. Subsequently, the trial court made findings of fact and conclusions of law and supplemental findings of fact and conclusions of law. This appeal followed.

**ANALYSIS**

Park appeals the trial court's judgment in seven issues. He presents five issues challenging the trial court's judgment in favor of the Association and two issues challenging the trial court's judgment in favor of Rostrata. We turn first to Park's issues challenging the judgment in favor of the Association.

15

**Issues presented against the judgment in favor of the Association**

Two of Park's issues center on the Association's failure to provide the statutorily required presuit notice. Park contends in his second issue that the Association's failure to provide notice deprived the trial court of jurisdiction over the case. In his third issue, he contends that the Association did not prove that it complied with "conditions precedent" required to sue because it failed to give the required presuit notice, to provide him with an opportunity to cure, and to participate in presuit mediation, and therefore, the trial court erred by rendering judgment in the Association's favor.

Relatedly, in his fourth issue, Park asserts that the trial court erred by denying his counterclaim for attorneys' fees under Property Code Section 5.006 because he should have prevailed on his counterclaim asserting that the Association breached the restrictive covenant requiring it to submit disputes to mediation.

In two of his issues, Park challenges the trial court's conclusions of law. In his first issue, Park contends that the trial court erred by concluding that Park did not fulfill the parties' agreement about the type of windows he would install because, in Park's view, the agreement was ambiguous. In his fifth issue, Park challenges the trial court's implied conclusion of law that the Association's conduct did not support his defense of "illegality," as well as the trial court's conclusions of law that (1) the Association's conduct did not support Park's affirmative defense of unclean hands; (2) the Association's decision to sue Park to enforce the Declaration and the approved plans and specifications was not arbitrary and capricious; and (3) the equities weigh in favor of the Association and other lot owners whose property is subject to the restrictions in the Declaration and that there is no disproportionate harm to Park.

16

***The Association's failure to provide statutorily required presuit notice***

Park contends that the Association's failure to provide presuit notice as required by Property Code Section 209.006 deprived the trial court of jurisdiction over the suit. In support of this issue, he argues that (1) the plain language of Chapter 209 expressly requires notice, a hearing, a right to cure, and other "due process" before a property owners' association sues a property owner; (2) late notice does not cure a Section 209.006 or 209.007 violation; (3) Section 209.008(b) does not allow an exception from the mandate to offer notice and other "due process" merely because the property owners' association foregoes attorneys' fees; and (4) the Association's late letter could not constitute effective notice.[4]

We begin with an overview of the relevant provisions of Chapter 209 of the Property Code. *See generally* Tex. Prop. Code §§ 209.001-.015 (Texas Residential Property Owners Protection Act). Chapter 209 governs the relationship between property owners' associations and property owners. Section 209.006(a) provides that before filing suit against an owner, a property owners' association "*must* given written notice to the owner."[5] *Id.* § 209.006(a) (emphasis added). Section 209.006(b) further provides that:

---

[4] Park raises some of these arguments within his first issue (which concerns his contention that he fulfilled the agreement that he argues is ambiguous), but we will consider them in conjunction with this issue. *See* Tex. R. App. P. 38.1(e) ("The brief must state concisely all issues or points presented for review. The statement of an issue or point will be treated as covering every subsidiary question that is fairly included.").

[5] In addition to providing written notice before filing a suit against an owner "other than a suit to collect a regular or special assessment or foreclose under an association's lien," an association must provide written notice before suspending an owner's right to use a common area, charging an owner for property damage, or levying a fine for a violation of the restrictions or bylaws or rules of the association. Tex. Prop. Code § 209.006(a). We are addressing only the presuit notice requirement.

17

The notice *must*:

(1)     describe the violation or property damage that is the basis for the suspension action, charge, or fine and state any amount due the association from the owner; and

(2)     inform the owner that the owner:

    (A)     is entitled to a reasonable period to cure the violation and avoid the fine or suspension unless the owner was given notice and a reasonable opportunity to cure a similar violation within the preceding six months; [and]

    (B)     may request a hearing under Section 209.007 on or before the 30th day after the date the owner receives the notice . . . .

*Id.* § 209.006(b) (emphasis added). The Association does not dispute that it failed to give the required notice to Park before filing suit.

Section 209.007 explains the parameters of the owner's right to a hearing. Subsection (a) states that:

> If the owner is entitled to an opportunity to cure the violation, the owner has the right to submit a written request for a hearing to discuss and verify facts and resolve the matter in issue before a committee appointed by the board of the property owners' association or before the board if the board does not appoint a committee.

*Id.* § 209.007(a). If the hearing is to be held before a committee, the Section 209.006 written notice must state that the owner has a right to appeal the committee's decision to the board. *Id.* § 209.007(b). After an owner requests a hearing, the association must hold the hearing not later than the 30th day after it receives the owner's request. *Id.* § 209.007(c). The notice and hearing provisions of Sections 209.006 and 209.007 do not apply if the association seeks a temporary restraining order or temporary injunctive relief or files a suit that includes foreclosure as a cause

18

of action. *Id.* § 209.007(d). Section 209.007 also provides that "[a]n owner or property owners' association may use alternative dispute resolution services." *Id.* § 209.007(e).

Section 209.008 governs attorneys' fees. It provides that an association may collect attorneys' fees and costs related to collecting amounts (including damages) due the association for enforcing restrictions or the association's bylaws or rules, but only if the owner is provided written notice that attorneys' fees and costs will be charged to the owner if the violation or delinquency continues after a date certain. *Id.* § 209.008(a). An owner is not liable for attorneys' fees incurred by an association that are related to a matter for which notice has been given under Section 209.006 if the fees are incurred before the conclusion of the Section 209.007 hearing, or if the owner does not request a hearing, before the date by which the owner must request a hearing. *Id.* § 209.008(b).

Park and the Association dispute whether Section 209.006's notice requirement is jurisdictional—i.e., failure to comply negates the trial court's subject-matter jurisdiction over the Association's suit—or is mandatory but not jurisdictional. This is a question of first impression. Park asserts that the notice requirement is jurisdictional, and therefore, the Association's failure to provide notice requires the trial court to dismiss its case. The Association responds that the requirement is mandatory, but not jurisdictional, and that Park waived the requirement by failing to timely object and request an abatement. The Association also contends that the notice it provided after filing suit operated to cure its failure to provide presuit notice.

We begin with the presumption that the Legislature did not intend to make presuit notice under Section 209.006 jurisdictional. *See City of DeSoto v. White*, 288 S.W.3d 389, 394 (Tex. 2009); *see also Dubai Petrol. Co. v. Kazi*, 12 S.W.3d 71, 76 (Tex. 2000) (noting modern trend toward reducing vulnerability of final judgments to attack based on lack of subject-matter

19

jurisdiction). Only clear legislative intent to the contrary can overcome this presumption. *City of DeSoto*, 288 S.W.3d at 394. We apply statutory-interpretation principles to determine whether a statutory requirement is jurisdictional. *Id.* We review de novo questions of statutory construction. *Molinet v. Kimbrell*, 356 S.W.3d 407, 411 (Tex. 2011).

To determine whether the Legislature intended a jurisdictional bar, we begin by examining the plain meaning of the statute, looking specifically for "'the presence or absence of specific consequences for noncompliance.'" *Crosstex Energy Servs., L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 392 (Tex. 2014) (quoting *City of DeSoto*, 288 S.W.3d at 396, and *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 495 (Tex. 2001)). We also consider the purpose of the statute and "'the consequences that result from each possible interpretation.'"[6] *Id.* (quoting *City of DeSoto*, 288 S.W.3d at 396, and *Helena Chem. Co.*, 47 S.W.3d at 495). Likewise, when determining whether a statutory requirement is mandatory, courts consider in particular any specific statutory consequences for failing to act by the statutory deadline and the purpose of the statutory provision. *See Chisholm v. Bewley Mills*, 287 S.W.2d 943, 945 (Tex. 1956).

---

[6] Park asserts that Chapter 209 is a "curative" and "remedial" statute and that we therefore must give it "the most comprehensive and liberal construction possible," quoting *City of Mason v. West Tex. Utils. Co.*, 237 S.W.2d 273, 280 (Tex. 1951) (involving statute whose purpose was to afford relief to utility companies from two supreme court decisions), and citing *Burch v. City of San Antonio*, 518 S.W.2d 540, 544 (Tex. 1975) (analyzing whether statute ratifying home-rule cities' elections for bonds applied to ratify city's delegation of eminent-domain power to water board), and *City of Waco v. City of McGregor*, 523 S.W.2d 649, 653 (Tex. 1975) (involving applicability of statute validating boundary lines of cities to attempted annexation of territory). All three cases, however, make clear that "curative statutes are liberally construed only to effectuate the intent of the legislature in enacting them and not to other ends" and that this rule of construction "does not obviate our duty to determine and apply legislative intent." *City of Waco*, 523 S.W.2d at 653 (citing *City of Mason* and *Burch*). In short, the principles to which Park alludes merely beg the question as to what the Legislature's intent is.

20

Section 209.006(a) states that a property owners' association "must" give notice before filing suit against an owner. Tex. Prop. Code § 209.006(a). The Code Construction Act explains that "'must' creates or recognizes a condition precedent," Tex. Gov't Code § 311.016(3), and the Texas Supreme Court has stated that "must" generally has a mandatory effect, creating a duty or obligation, *see Helena Chem. Co.*, 47 S.W.3d at 493. In this case, although there are no statutory consequences for noncompliance specified in Chapter 209, *see generally* Tex. Prop. Code §§ 209.001-.015, we must also consider the purpose of Section 209.006's presuit-notice requirement. While statutory provisions that are included merely to "promot[e] the proper, orderly and prompt conduct of business, are not generally regarded as mandatory," *Chisholm*, 287 S.W.2d at 945, courts generally "construe a statutory provision as mandatory when the power or duty to which it relates is for the public good," *Albertson's Inc. v. Sinclair*, 984 S.W.2d 958, 961 (Tex. 1999). We conclude that Section 209.006(a)'s purpose is similar to presuit-notice provisions found in other statutes: "to discourage litigation and encourage settlements." *Hines v. Hash*, 843 S.W.2d 464, 468-69 (Tex. 1992) (DTPA) (quoting *Jim Walter Homes, Inc. v. Valencia*, 690 S.W.2d 239, 242 (Tex. 1985) (DTPA)); *see also Schepps v. Presbyterian Hosp. of Dallas*, 652 S.W.2d 934, 938 (Tex. 1983) (Medical Liability and Insurance Improvement Act). In light of these considerations, we conclude that Section 209.006's notice requirement is mandatory.

Having determined that the notice requirement is mandatory, we next consider whether it is also jurisdictional. Nothing in the plain language of Chapter 209 indicates that the Legislature intended the notice requirement to be jurisdictional. *See Crosstex Energy Servs.*, 430 S.W.3d at 392 (providing example of unequivocal language in Labor Code making certain filing

21

deadlines jurisdictional and explaining that even mandatory dismissal language does not necessarily compel conclusion that statute is jurisdictional). Chapter 209's lack of a provision dictating dismissal for noncompliance is a circumstance weighing in favor of a nonjurisdictional interpretation. *See Helena Chem. Co.*, 47 S.W.3d at 495; *see also Albertson's*, 984 S.W.2d at 962 (explaining that lack of consequence for noncompliance "is significant when considering the entire statute").

"When a statute is silent about the consequences of noncompliance, we look to the statute's purpose to determine the proper consequences." *Helena Chem. Co.*, 47 S.W.3d at 494. Chapter 209's title—the Texas Residential Property Owners Protection Act—reflects a general concern by the Legislature to protect the rights of property owners vis-à-vis property owners' associations, and Park cites anecdotal legislative history to the same effect. However, this objective, in itself, does not imply that the Legislature intended to deprive Texas trial courts of subject-matter jurisdiction when associations fail to provide the notice required under the Act.

The final factor to be considered—the consequences of the alternative interpretations—suggests that the notice requirement is not jurisdictional. Under Park's interpretation, an association's failure to provide presuit notice to an owner of the owner's entitlement to a reasonable period to cure the violation and to request a hearing within 30 days would preclude any consideration of the association's claim by a trial court. In addition, any judgments in cases that were rendered in the absence of presuit notice would be void for lack of jurisdiction and indefinitely subject to collateral attack. *See In re United Servs. Auto. Ass'n*, 307 S.W.3d 299, 309-10 (Tex. 2010) (concluding that two-year period for filing suit under Texas Commission on Human Rights Act is mandatory but not jurisdictional). And while Park insists that any remedy short of a

22

jurisdictional bar would thwart the statute's purpose of providing property owners with the opportunity to engage in presuit dispute-resolution efforts before incurring attorneys' fees, the Texas Supreme Court has concluded in similar cases that "abatement of the action for the statutory notice period is more consistent with the purpose of notice than dismissal." *Hines*, 843 S.W.2d at 468-69 (considering effect of noncompliance with DTPA's notice provision); *see also, e.g.*, *Schepps*, 652 S.W.2d at 938 (considering effect of noncompliance with requirement to give notice of health-care liability claim).[7] In most cases, timely abatement for the statutory notice period will allow the parties an adequate opportunity to explore settlement and to avoid litigation expenses. *See Hines*, 843 S.W.2d at 469 (explaining that abatement must be requested "with the filing of an answer or very soon thereafter" to be timely). To the extent that an association's initiation of litigation without notice may cause negative effects like "expense to the defendant in filing an answer, requesting abatement, and otherwise responding to the litigation" or may otherwise thwart the purpose of Chapter 209's notice requirement, "the trial court is empowered to remedy [those negative effects]

---

[7] Park contends that Chapter 209 creates a "comprehensive remedial scheme" akin to the one created by the Texas Commission on Human Rights Act (TCHRA). He relies heavily on two cases addressing the TCHRA, *City of Waco v. Lopez*, 259 S.W.3d 147 (Tex. 2008), and *Lueck v. State*, 325 S.W.3d 752 (Tex. App.—Austin 2010, pet. denied). These cases do not support Park's argument that Section 209.006's notice requirement is jurisdictional. By means of the TCHRA, the Legislature established a comprehensive administrative scheme governing employment-discrimination disputes and granting authority to a state-agency administrative body to review and resolve claims. *See Lopez*, 259 S.W.3d at 153-54 (determining that TCHRA is exclusive state statutory remedy for public employees alleging retaliation from activities protected under TCHRA); *Lueck*, 325 S.W.3d at 765 (holding that timely filing requirement is part of administrative process that must be exhausted before filing suit for employment discrimination). Failure to exhaust the TCHRA's remedies, including the timely filing of an administrative complaint, before filing a civil action is a jurisdictional defect. *See Lueck*, 325 S.W.3d at 761-62. In contrast, the process required by Chapter 209 is more akin to the presuit notice requirements addressed in *Hines* and *Schepps*, which seek to foster settlement rather than delegate authority to initially decide the dispute. *See* Tex. Prop. Code § 209.007(b).

23

by appropriate sanctions."[8] *Id.* We presume the Legislature was aware of this existing law when it enacted Chapter 209. *See American Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 877-78 (Tex. 2001).

Having considered all the factors, we conclude that the Legislature did not intend to make notice under Section 209.006 jurisdictional. *See City of DeSoto*, 288 S.W.3d at 394; *see also Dubai Petrol. Co.*, 12 S.W.3d at 76. Accordingly, we conclude that Section 209.006's notice provision is mandatory but not jurisdictional. Therefore, a complete lack of notice may be cured by a defendant's timely request for abatement to allow for provision of the notice. *See Hines*, 843 S.W.2d at 469.

A party may, however, waive a mandatory nonjurisdictional requirement by failing to timely object. *Crosstex Energy Servs.*, 430 S.W.3d at 391. In this case, Park waived notice under Section 209.006 by failing to request abatement.[9] *See Hines*, 843 S.W.2d at 469. We overrule Park's second issue.

---

[8] In addition, we note that Chapter 209 limits an association's attorneys' fees if it delays sending notice. *See* Tex. Prop. Code § 209.008. If an association fails to provide presuit notice or to provide notice before significant litigation costs have been incurred, it risks forfeiting all or a substantial portion of its attorneys' fees.

[9] Park couches these arguments in terms of "due process." He asserted a counterclaim for violation of "due process," which the trial court denied. While he never argues in his brief that the trial court erred by denying this counterclaim or by concluding that "Park does not have any cognizable claim against the Association for violation of any due process rights," to the extent his brief could be liberally construed to raise this issue, we conclude that the trial court's conclusion was correct. The Association is a private nonprofit corporation and did not engage in state action. The Due Process Clause of the Fourteenth Amendment does not apply to private conduct, unless state action can be found. *See Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 349 (1974). On this record, the Association's action does not have a "sufficiently close nexus" with the State to fairly treat the Association's action as State action.

24

*Performance of "conditions precedent"*

In his third issue, Park also relies on the Association's failure to provide presuit notice of his right to a hearing to support his argument that the Association failed to prove that it performed all conditions precedent to suit under the restrictive covenants. He asserts that the Association was bound by the terms of its own Enforcement Policy not to sue until after satisfying the notice requirements of Chapter 209, by the terms of its bylaws to submit the dispute to mediation or alternative dispute resolution before suing, and by the terms of its Amended Declaration to give property owners "the opportunity to remedy the violation" before suing.

To the extent that Park could be considered to have raised this issue below, he only asserted arguments in the trial court related to the terms of the Enforcement Policy and the bylaws, not the Declaration. Park never pled or argued below that the Association failed to perform conditions precedent to suit, nor did he request findings of fact or conclusions of law on the issue of failure to perform conditions precedent. Instead, he asserted counterclaims that the Association breached its contract with him by failing to seek mediation before filing suit and that it violated due process by failing to satisfy the requirements of Sections 209.006 and 209.007. He also asserted in his motion for new trial that the Association's incorporation of Chapter 209 into the Enforcement Policy supported his breach-of-contract counterclaim. We have found no reference in the record, however, to an argument by Park that the Association failed to satisfy a condition precedent by violating the Declaration's provision allowing the Association to seek relief for an owner's violation, provided that the Association first gives the owner "the opportunity to remedy the violation prior to the filing of the suit." Moreover, the Association first notified Park of his violation and requested

25

that he remedy it more than 30 days before it filed suit. Accordingly, we conclude that Park has failed to show reversible error based on his argument that the Association failed to perform a condition precedent related to the provision in the Declaration.

We next address Park's argument that the other two documents created conditions precedent. The Enforcement Policy provides that "the Association reserves the right to proceed with legal actions to enforce the Declaration and Guidelines at any time after the notice requirements of Chapter 209 of the Texas Property Code have been met." Park urges that this is a condition precedent "that must happen or be performed before a right can accrue to enforce an obligation." *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 283 (Tex. 1998). We disagree. To make performance of a provision specifically conditional, terms such as "if," "provided that," "on condition that," or some similar phrase of conditional language must normally be included. *Criswell v. European Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex. 1990). Without this type of language, to prevent a forfeiture, the provision will be construed as a covenant. *Id.* When construing contracts, we avoid forfeiture by finding a condition precedent when another reasonable reading is possible. *Id.* In this case, construing the contract as a whole, including its overarching purpose of allowing the Association, its Board, and the Master Design Committee the power to govern the development and maintenance of the subdivision according to a common plan, we conclude that it is reasonable to interpret the Association's reservation of its right to proceed with legal action to enforce the Declaration and Guidelines after compliance with Chapter 209's notice requirements as a promise, not a condition, in the absence of conditional language. *See Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3-5 (Tex. 1976).

26

Similarly, the language in the Bylaws contains no conditional language. The provision states that if a dispute arises "which cannot be resolved in good faith through informal discussion, *the parties agree* to submit the dispute to mediation or some other mutually agreeable alternative dispute resolution process." (Emphasis added.) This language constitutes a mutual promise by the parties, not a condition precedent to be fulfilled by the Association before filing suit. In addition, the provision contains no language indicating that mediation must occur before any suit is filed. The parties ultimately engaged in mediation before trial. We overrule Park's third issue.

### Attorneys' fees

In his fourth issue, Park claims that he is entitled to attorneys' fees under Section 5.006 of the Property Code because he should have prevailed on his breach-of-contract counterclaim against the Association. *See* Tex. Prop. Code § 5.006 (requiring court to allow reasonable attorneys' fees to prevailing party who asserted action based on breach of restrictive covenant). Park based his breach-of-contract counterclaim on his allegation that the Association breached the Bylaws by failing to submit the parties' dispute to mediation before filing suit. For the reasons discussed above, the trial court correctly concluded that "[t]he Association did not breach any contract with Park by failing to mediate the disputes in this lawsuit before the Association filed the lawsuit." Accordingly, we overrule Park's fourth issue.

### The trial court's conclusions of law

In his first and fifth issues, Park challenges some of the trial court's conclusions of law. We review a trial court's conclusions of law de novo. *BMC Software Belg., N.V. v. Marchand*,

27

83 S.W.3d 789, 794 (Tex. 2002). "We defer to unchallenged findings of fact that are supported by some evidence." *Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC*, 437 S.W.3d 518, 523 (Tex. 2014) (citing *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696-97 (Tex. 1986)). The appellant may not challenge the trial court's conclusions of law for factual sufficiency, but we may review the trial court's legal conclusions drawn from the facts to determine whether the conclusions are correct. *BMC Software*, 83 S.W.3d at 794. We will not reverse an erroneous conclusion if the trial court rendered the proper judgment. *Id.*; *see also Swate v. Medina Cmty. Hosp.*, 966 S.W.2d 693, 697 (Tex. App.—San Antonio 1998, pet. denied) ("Incorrect conclusions of law will not require reversal if the controlling findings of facts will support a correct legal theory."). In other words, we will uphold the trial court's conclusions if the judgment can be sustained on any legal theory supported by the evidence. *Swate*, 966 S.W.2d at 697.

### 1) *Park breached the Declaration and the window specification is not ambiguous*

We turn to Park's first issue presented, in which he challenges the trial court's conclusions that (1) Park substantially breached the Declaration by installing windows that did not conform to the plans that the Master Design Committee had approved and (2) the window specification of "50/50 Sash divide, 2/2 paned" is not ambiguous. Deciding whether a contract is ambiguous is a question of law that we decide by examining the contract as a whole in light of the circumstances present when the contract was entered. *J. M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003); *see also Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983). An unambiguous contract is worded in a way that can be given a certain or definite legal meaning or interpretation;

we construe unambiguous contracts as a matter of law. *Coker*, 650 S.W.2d at 393. An ambiguous contract is one that is subject to two or more reasonable interpretations after applying the pertinent rules of construction. *J.M. Davidson*, 128 S.W.3d at 229. We consider the parties' interpretations and admit extraneous evidence to determine the true meaning of the contract only when a contract is ambiguous. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333-34 (Tex. 2011).

Park primarily asserts that the trial court erred by concluding that he did not fulfill the parties' agreement about the type of windows he would install. The crux of Park's argument is that he fulfilled the parties' January 2009 agreement that he would use "the 50/50 window system with vertical divides only" because the windows he installed were the same size on the top and bottom halves and opened vertically.[10] The main problem with this argument, however, is that the windows Park installed have horizontal divides in the top and bottom halves, in addition to vertical divides:



---

[10] Contrary to Park's argument, opening vertically is not the same thing as having "vertical divides." A window that opens vertically necessarily has a horizontal rail at the top and bottom of each sash (the movable window panel). Moreover, the Association would not have needed to use the word "only" to describe the "vertical divides," if by "divide" it meant how the window opens. A window cannot open both vertically and horizontally.

Thus, even if we agreed that the January 2009 agreement was the parties' final agreement about the type of windows that Park planned to install (as Park asserts and as we discuss below), the windows he installed do not comply with that agreement.

In addition to arguing that the installed windows comply with the parties' January 2009 agreement, Park contends that the Association's inclusion of the phrase "2/2 Paned" on the plan approval checklist that he signed and submitted in June 2009, its April 2009 amendment of the Guidelines to state that visible windows must be "50/50 sash and 2 over 2 vertical panes," and its reliance on his June 2009 drawings were attempts to modify the January 2009 agreement requiring "vertical divides only" without notice to him and without his knowledge. Park asserts that the parties intended the January 2009 agreement to be their final agreement and that "the Association provided no evidence—no document, no testimony—that anyone ever told Dr. Park that the drawings, parenthetical phrase on the Checklist (which the Association admits was 'only a note placed as a reminder' . . .), or anything else modified the parties' specific agreement in January 2009." In fact, throughout the case, the Association relied on the Declaration and the Master Design Guidelines to demonstrate its requirements (which Park does not dispute) that (1) the Committee's final approval of plans is required before construction begins, and (2) after plans are approved, an owner must submit any exterior changes to the approved drawings for approval by the Committee.[11] Moreover, Park's disclaimer of knowledge that the Committee required visible windows to be "2/2 Paned" is

[11] Both the original and amended versions of the Guidelines contain these two requirements. Both versions also reserve the Committee's right to withhold final approval of any item even if it had not been disapproved in prior submissions, and both explain that any oversight by the Committee of any noncompliant item does not relieve the owner from compliance with the Guidelines.

30

difficult to reconcile with the plan approval checklist, which was signed by Park, his architect, and his builder, and which stated that windows "([f]ront and sides must be 50/50 Sash Divide, 2/2 Paned)."[12] Most importantly, the checklist was submitted contemporaneously with his revised plans, which depicted revised windows that conformed to these requirements—i.e., equally proportioned top and bottom sashes with 2 over 2 vertical panes. In other words, the June drawings conform with the April Guidelines' and the June checklist's guidance, as well as with the parties' January agreement.[13] Park does not address the original Guidelines' requirement that an owner must submit any changes to approved drawings to the Committee for approval. He does not dispute that he never submitted to the Committee a request for prior approval of the windows he installed. And he does not dispute that the windows he installed differ from the windows in his approved drawings.

---

[12] Park argues that his builder concluded that Park could use the installed windows because the builder did not understand what the "50/50 sash, 2/2 paned" term meant and that no document led the builder to conclude that the Association would not allow the installed windows. But the builder testified that Rostrata's contract with Park provided that the architectural specifications, which were more detailed than the approved plans, were to override the plans in case of conflict. He stated that Rostrata "built the house to the specifications which override the plans. And there was a question regarding the windows, which is why there was an e-mail sent [to Park] to confirm the actual windows that would be installed." The builder later stated, "[W]hat's installed and what was called out in the specifications by no means match what the architectural plans show. That's—that was known—whenever I sent an e-mail stating, Please confirm the colonial design." This testimony implies that Park was aware that the windows he chose to install differed from the windows on the plans approved by the Committee.

[13] Park contends that the amended Guidelines' language is ambiguous and that no one testified that the Association sent Park the new Guidelines. The trial court found, and we note, that the original Guidelines charge owners with the responsibility of "obtaining from the Master Design Committee a copy of the most recently revised Master Design Guidelines, and [they] should inquire if any substantive amendments to the Master Design Guidelines have been adopted since the most recent printing of the Master Design Guidelines." Whether Park actually saw the amended Guidelines is immaterial to our resolution of this issue. It is undisputed that he signed the plan approval checklist with the "2/2 Paned" language and submitted revised plans that complied with this requirement and the "vertical divides only" term.

31

The installed windows do not comply with either the "vertical divides only" or the "2/2 Paned" requirement. For this reason, the trial court did not err by concluding that "Park substantially breached the Declaration by both installing exterior windows and transoms at the home on his Property that did not conform to the plans and specifications for his home approved by the [Committee], and by doing so without submitting revised plans and specifications to the [Committee]."

The trial court also correctly concluded that "[t]he window specification of 50/50 Sash Divide, 2/2 paned" is not ambiguous. Park never explains how this term can be interpreted to mean anything other than a window configuration like the one depicted in his approved plans:



His argument that it represents a change to the "vertical divides only" language does not make the "2/2 paned" term ambiguous. As discussed above, the "2/2 paned" term did not change the parties' agreement that the windows would have "vertical divides only"—at most, it provided more specificity about the number of allowed vertically divided panes. The "50/50 Sash Divide, 2/2

32

paned" window specification is not ambiguous, and consequently, we do not consider extraneous evidence in support of Park's argument that it is ambiguous.[14] *See Italian Cowboy Partners, Ltd.*, 341 S.W.3d at 333-34. We overrule Park's first issue.

> **2)      *The trial court correctly concluded that the Association's conduct did not support Park's affirmative defenses and was not arbitrary and capricious and that the equities supporting an injunction weigh in the Association's favor***

In his fifth issue, Park asserts that a number of doctrines independently establish that the trial court erred by granting the Association a permanent injunction to enforce the Declaration. The grant or refusal of a permanent injunction is ordinarily within the trial court's sound discretion. *Voice of Cornerstone Church Corp. v. Pizza Prop. Partners*, 160 S.W.3d 657, 667 (Tex. App.—Austin 2005, no pet.); *Texas Health Care Info. Council v. Seton Health Plan, Inc.*, 94 S.W.3d 841, 851 (Tex. App.—Austin 2002, pet. denied). A trial court "abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *BMC Software,* 83 S.W.3d at 800 (quoting *Johnson v. Fourth Court of Appeals,*

---

[14] Park urges us to consider testimony from his builder that Park suggests proves ambiguity. The builder testified that before the issue arose with Park's windows, he was familiar with the "2 over 2 panes" term, but not with the "50/50" term, which he interpreted to mean a double-hung window (i.e., two sashes that can be slid up or down in a single frame). The "2 over 2 panes" term is the only one at issue here. The builder never suggested any interpretation of the "50/50 sash, 2/2 paned" term that differs from the windows depicted on the approved drawings. Moreover, the builder testified that after talking to his window supplier when the Association notified Park of the violation, the window supplier "set [him] straight and defined what a true 2 over 2, 50/50 sash is, which is what is depicted on the elevation sheet [on the approved plans]." *See National Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.*, 907 S.W.2d 517, 521 n.6 (Tex. 1995) (noting that courts may consult extrinsic evidence to determine commonly understood meaning of term within a particular industry). Even if we had reason to consider it, the builder's testimony does not support a conclusion that the "2/2 paned" term is ambiguous.

700 S.W.2d 916, 917 (Tex. 1985)). In this case, the standard of review becomes somewhat more complex because Park challenges the trial court's conclusions of law that support the trial court's grant of injunctive relief. With the standards of review for injunctive relief and for review of the trial court's conclusions of law in mind, we must consider de novo whether the trial court's legal conclusions drawn from the facts are correct to determine whether the trial court clearly abused its discretion by granting the permanent injunction. *See Voice of Cornerstone Church Corp.*, 160 S.W.3d at 667 (considering injunctive relief in context of summary-judgment standard of review); *Texas Health Care Info. Council*, 94 S.W.3d at 851-52 (same).

Park argues that the trial court erred by impliedly concluding that the Association's conduct did not support his defense of illegality, as well as by concluding that (1) the Association's conduct did not support Park's affirmative defense of unclean hands; (2) the Association's decision to sue Park to enforce the Declaration and the approved plans and specifications was not arbitrary and capricious; and (3) the equities (including the availability of other remedies) weigh in favor of the Association and other lot owners whose property is subject to the restrictions in the Declaration and that there is no disproportionate harm to Park. Park relies on the Association's failure to provide him with presuit notice of his right to a hearing as the basis for his defenses of illegality and unclean hands and for his contention that the Association acted in an arbitrary and capricious manner by suing him to enforce compliance with the approved plans.

### (2)(a) Illegality

Park contends that the Association's failure to provide presuit notice renders the Declaration unenforceable because of the Association's "failure to comply with the law," citing

34

*Mabry v. Priester*, 338 S.W.2d 704, 706 (Tex. 1960). The illegality of a contract is an affirmative

defense that must be pled, Tex. R. Civ. P. 94, unless the illegal nature of the document is apparent

from the plaintiff's pleadings and established as a matter of law. *See Phillips v. Phillips*, 820 S.W.2d

785, 789 (Tex. 1991) (explaining that plaintiff who pleads agreement that is illegal on its face

anticipates defense and that courts will not enforce plainly illegal contract even if parties do not

object); *see also Mabry*, 338 S.W.2d at 706 (holding that if contract between lienholder and

landowner was illegal because lienholder was not architect in good standing at time plans were

prepared, landowner should have affirmatively pled contract's illegality); *VanHuss v. Buchanan*,

508 S.W.2d 412, 414 (Tex. Civ. App.—Fort Worth 1974, writ dism'd w.o.j.) (holding defense of

illegality waived because defendant failed to plead that contract sued on was illegal or in violation

of antitrust laws). The affirmative defense of illegality focuses on the legality of the contract itself,

not the manner in which the contract is performed. *See SCI Tex. Funeral Servs., Inc. v. Hijar*, 214

S.W.3d 148, 156 (Tex. App.—El Paso 2007, pet. denied) (holding that allegation that funeral

services company did not give notice required by statute would not support finding that contract to

provide funeral services was illegal). Park failed to plead that the contract was illegal because it

created an obligation that violates the law, because the contract did not comply with some statutory

or legal requirement, or because the contract could not have been performed in a legal manner.[15]

Instead, Park contends that because the Association admitted that it did not fully comply with the

Property Code's presuit-notice requirement, it pled that it had acted illegally, precluding this Court

---

[15] Park did not plead illegality as an affirmative defense. He raised the issue in his motion for new trial, arguing that the Association's failure to comply with the Property Code's presuit notice requirement rendered the restrictive covenants unenforceable.

from finding that Park waived the defense of illegality. *See Phillips*, 820 S.W.2d at 789. Assuming without deciding that Park did not waive this issue, we conclude that Park failed to establish that the restrictive covenants are illegal on their face, *see id.*, that they fail to comply with statutory or other legal requirements, *see Mabry*, 338 S.W.2d at 706, or that they could not have been performed in a legal manner, *see SCI Tex. Funeral Servs.*, 214 S.W.3d at 156. The Association's failure to provide presuit notice does not render the restrictive covenants illegal. *See id.* Consequently, Park's illegality argument does not preclude the trial court's grant of a permanent injunction.

### (2)(b) Unclean hands

Similarly, the Association's failure to provide presuit notice does not support Park's affirmative defense of unclean hands. Under the doctrine of unclean hands, a court may refuse to grant equitable relief, such as an injunction, sought by "one whose conduct in connection with the same matter or transaction has been unconscientious, unjust, or marked by a want of good faith, or one who has violated the principles of equity and righteous dealing." *In re Jim Walter Homes, Inc.*, 207 S.W.3d 888, 889 (Tex. App.—Houston [14th Dist.] 2006, orig. proceeding); *see also Lazy M Ranch, Ltd. v. TXI Operation, LP*, 978 S.W.2d 678, 683 (Tex. App.—Austin 1998, pet. denied) ("[A] court may refuse to grant equitable relief to a plaintiff who has been guilty of unlawful or inequitable conduct regarding the issue in dispute."). In restrictive-covenant cases, the doctrine applies only "when the plaintiff is guilty of the same actions of which the defendant is accused." *Fox v. O'Leary*, No. 03-11-00270-CV, 2012 WL 2979053, at *7 (Tex. App.—Austin July 10, 2012, pet. denied) (mem. op.) (considering whether both parties violated setback restrictions). Park asserts the Association's unlawful and inequitable conduct that bars an injunction includes its failure to provide

36

presuit notice of Park's right to request a hearing, failure to submit the dispute to mediation before suit, and alleged failure to provide him an opportunity to remedy the violation before suit—all of which he asserts violate the restrictive covenants. These asserted violations are not the same actions of which Park is accused. *See id.* Moreover, the party claiming unclean hands bears the burden of showing that it was injured by the other party's unlawful or inequitable conduct. *Paciwest, Inc. v. Warner Alan Props., LLC*, 266 S.W.3d 559, 571 (Tex. App.—Fort Worth 2008, pet. denied). The doctrine should not be applied unless the defendant has been seriously harmed and the wrong complained of cannot be corrected without applying the doctrine. *Id.* The only harm that Park asserts is that "the Association pummeled [him] with litigation, creating an immensely stressful situation, destroying the pleasure of a new home, and forcing him to pay an attorney and to face increased risks of paying the association's lawyer and the $200 per day statutory damages, for eleven (11) months before for the first time 'offering' a post-lawsuit 'hearing.'" But the trial court could also have attributed any harm suffered by Park to his own decision to install windows other than those depicted on his approved plans. He never indicated any willingness to the Association to consider complying with its request to conform his windows to the approved plans, instead seeking to pay a fine less than the amount it would cost him to replace the windows. In addition, the record reflects that the parties had only engaged in written discovery, and no motions, hearings, depositions, or other significant litigation activity had occurred before the Association provided him with the statutory notice of his right to request a hearing in September 2010. The trial court did not require Park to pay attorneys' fees incurred by the Association before it sent the notice. In short, this is not the sort of serious harm that cannot be corrected without applying the unclean-hands doctrine. *See*

*id.* The trial court did not abuse its discretion by concluding that "[t]he Association's conduct in this matter has not been unconscientious or unjust, or marked by a want of good faith, nor has it violated principles of equity and righteous dealing, so as to support Park's affirmative defense of unclean hands."

### (2)(c) Arbitrary and capricious enforcement

Park also argues that Property Code Section 202.004(a) bars the Association's claim for injunctive relief. Section 202.004(a) provides that "[a]n exercise of discretionary authority by a property owners' association . . . concerning a restrictive covenant is presumed reasonable unless the court determines by a preponderance of the evidence that the exercise of discretionary authority was arbitrary, capricious, or discriminatory." Park asserts that the Association lacked authority to sue him because it failed to provide him with statutorily required presuit notice of his right to a hearing and because it violated restrictive covenants, as described in his conditions-precedent argument.

Park relies on *Anderson v. New Property Owners' Ass'n of Newport, Inc.*, 122 S.W.3d 378, 390 (Tex. App.—Texarkana 2003, pet. denied), to support his argument that the Association acted without established authority. While the court in *Anderson* concluded that it was an arbitrary and capricious exercise of discretionary authority for a neighborhood association to reject a property owner's driveway plans when that association did not have "established authority" to approve or reject plans, the court's conclusion was based on facts not present here. *See id.* After reviewing the declarations and a later assignment of rights, the court determined that the association in *Anderson* had not been assigned the authority to act as a property owners' association or as an architectural control committee, although it was able to sue in its representative capacity to enforce deed

38

restrictions. *See id.* at 385-90. Park does not contend that the Association lacked authority to enforce the deed restrictions or that the Master Design Committee lacked authority to approve or reject his plans. His challenge to the Association's authority instead rests on the Association's failure to provide presuit notice and its purported violations of the restrictive covenants. But the Association derives its authority from the powers vested in it by the Declaration—not from compliance with the requirement to provide presuit notice or its promises to submit disputes to mediation and to provide owners with the opportunity to remedy violations. We conclude that the Association acted within its discretionary authority when it sued Park to enforce the restrictive covenants.

Park also asserts that the Association's decision to sue him was arbitrary because, he argues, "the Association only allowed Dr. Park *two days* to act," and because in one other case the Association had allowed a variance for noncompliant windows that are hidden from view from the street by trees. (Emphasis added.) Park bore the burden of proving that the Association's exercise of authority was arbitrary because the Association was entitled to a presumption that its exercise of discretionary authority was reasonable. *See* Tex. Prop. Code § 202.004(a); *see also Uptegraph v. Sandalwood Civic Club*, 312 S.W.3d 918, 933 (Tex. App.—Houston [1st Dist.] 2010, no pet.). First, Park mischaracterizes the length of the time period between the Association's notification that his windows did not comply with the approved plans and its filing of the suit. The Association notified him of the violation on September 28, 2009, and filed suit on October 30, 2009. In the interim period, there was substantial correspondence between the parties on the issue, including one letter in which the Association asked Park to provide it with written assurances within two working days from the date of the letter that the windows would be made to conform to the Committee's requirements and his approved plans. Park offered to pay the Association $5,000 to keep the

39

noncompliant windows in place, but he never requested additional time to provide the Committee with assurances, and he never indicated that he would install windows that complied with the approved plans. The trial court heard evidence that his response to the Committee was a refusal to make changes and also accusations that the Committee was guilty of misconduct and discrimination. Committee member Travis Williams testified that there was "zero indication from Dr. Park that he was willing to consider anything other than pursuing legal action against us." It was not until the Committee sent its final letter to Park two weeks before filing suit that it advised him that because the Committee's decision was final and binding under the Declaration's provisions, he must "remove the currently installed windows and commence installation of the approved window configuration" within two working days from the letter's date. Based on this evidence, the trial court did not err by determining that Park did not overcome the presumption that the Association's exercise of its authority was reasonable.

Nor did the trial court err by determining that the sole variance granted by the Association for window configuration also failed to overcome the statutory presumption of reasonableness. Park does not challenge the trial court's finding of fact related to the other home, which states:

> The Committee has permitted only one other home [of more than 50 homes] in the Subdivision to have windows that are different than the "50/50 Sash Divide, 2/2 paned" specification. That home is distinguishable from Park's Property because it is set back approximately 400 feet from the street and almost completely obscured by dense trees and other native vegetation, and as a result the windows in that home are not visible from the street. In contrast, Park's home is situated much closer to the street and prominently featured in the Subdivision, located toward the entrance of the Subdivision on the Subdivision's major thoroughfare, and the exterior windows of his home are clearly visible from the street without cover of native vegetation.

40

In addition, while that homeowner had complied with the Association's process for submitting a written variance, Park never submitted any written request that complied with the Declaration. Instead, Park's attorney had suggested that Park be allowed to plant new trees to screen the windows. The Committee declined the offer because the screening provided by new, 15-gallon trees would be limited compared to the 400 feet of juniper and mature trees that screened the other homeowner's property from street view and because Park's offer suggested that the Association pay for the screening and for his attorney's fees. Based on the evidence supporting the trial court's finding of fact on this issue and the other evidence in the record related to the time period before suit and the Association's authority to sue, the trial court did not err by concluding as follows:

> The Association's decision to file suit against Park to enforce the Declaration and his approved plans and specifications, and the [Committee]'s and the Association's decision to deny Park permission to keep the nonconforming exterior windows and transoms he installed at his home, were not arbitrary, capricious or discriminatory. As a result, Park did not meet his burden of proof to rebut the presumption under Section 202.004(a) of the Texas Property Code that those decisions by the [Committee] and the Association were reasonable.

### (2)(d) Weight of equitable considerations supporting injunctive relief

Injunctive relief ordinarily may only be granted upon a showing of (1) the existence of a wrongful act; (2) the existence of imminent harm; (3) the existence of irreparable injury; and (4) the absence of an adequate remedy at law. *Jim Rutherford Invs., Inc. v. Terramar Beach Cmty. Ass'n*, 25 S.W.3d 845, 849 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). For restrictive-covenant cases, however, there is a well-settled exception to the general rule: when a substantial breach of the covenant is shown, it is not necessary to show the existence of any particular amount

41

of damages or to show that the injury will be irreparable. *Jennings v. Bindseil*, 258 S.W.3d 190, 198 (Tex. App.—Austin 2008, no pet.); *Gigowski v. Russell*, 718 S.W.2d 16, 21 (Tex. App.—Tyler 1986, writ ref'd n.r.e.). While Park acknowledges this exception, he contends that the trial court abused its discretion by granting the permanent injunction because the Association had an adequate remedy at law in the form of money damages or imposition of a fine for his violation.

"A remedy at law is not adequate unless that remedy is as complete, practical, and efficient to the ends of justice and its prompt administration as is equitable relief." *Gigowski*, 718 S.W.2d at 22. There is evidence in the record that the purpose of the restrictive covenants in the Declaration is to benefit all property owners in the subdivision "by the preservation of the value, character and desirability of the Subdivision." In this case, as in *Gigowski*, "[i]t is probably impossible at this time to ascertain the damages to the other homeowners with any degree of accuracy." *Id.* The Association members' "remedy at law is inadequate if their damages cannot be determined with some precision." *Id.* Park does not challenge the court's grant of injunctive relief based on the Association's failure to show any other element, and we conclude that the trial court did not err by impliedly concluding that the Association had made the showing necessary for injunctive relief.

Park also challenges the trial court's conclusion that:

> In granting an injunction requiring Park to install exterior windows and transoms at his home in conformance with those in the plans and specifications approved by the [Committee], the equities weigh in favor of the Association and the other lot owners who acquired their property on the strength of the restrictions in the Declaration, and do not weigh in favor of Park. There is no disproportionate harm to Park of considerable magnitude to justify a refusal to enforce the Declaration and his approved plans and specifications.

When determining whether it would be inequitable to enforce a restrictive covenant against a particular property owner, "we must weigh the equities of the owner in violation of the covenant against the equities favoring other lot owners who acquired their property on the strength of the restriction." *See id.* (citing *Cowling v. Colligan*, 312 S.W.2d 943, 946 (Tex. 1958)). The court's judgment must arise out of a balancing of equities or of relative hardships. *Cowling*, 312 S.W.2d at 946. The fact that enforcing the restrictions may cause one owner greater injury does not compel denial of injunctive relief. *Gunnels v. North Woodland Hills Cmty. Ass'n,* 563 S.W.2d 334, 338 (Tex. Civ. App.—Houston [1st Dist.] 1978, no writ). A disproportion between the harm the injunctive relief causes and the benefit it produces must be of considerable magnitude to justify a refusal to enforce the restrictions. *Cowling*, 312 S.W.2d at 946; *Gunnels,* 563 S.W.2d at 338.

Park does not challenge the trial court's findings of fact that are relevant to the harm caused by the injunctive relief, which include findings that "[t]he window and transom designs that Park installed are out of harmony with the other homes," and that at the time of construction, when the Association and the Committee demanded that Park replace the windows with ones compliant with his approved plans, the cost to replace the windows was approximately $15,000.[16] In addition, the trial court found that "at that time, Park's builder offered to pay one-half of that estimated cost, leaving Park to pay only $7,500.00 in estimated replacement costs. At the time of trial, after

_____

[16] Another undisputed fact finding is that "[t]he more than 50 homes in the subdivision that are visible from the street reflect exterior window designs consistent with those represented in Park's approved plans and specifications and the '50/50 Sash Divide, 2/2 paned' specification contained in Park's Plan Approval Checklist and the amended Guidelines." There was also evidence presented at trial that allowing Park to keep his noncompliant windows would create concerns about the Association's ability to enforce its decisions to approve or reject plans in the future.

43

construction of Park's home had been completed, the estimated cost to replace such windows and transoms was approximately $20,000.00." Finally, the court found that "[t]he total cost for the construction of Park's home was between $900,000.00 and $950,000.00."

Under these facts, we cannot say that the trial court abused its discretion by concluding that the balance of equities favors the Association. In other cases involving much greater costs to remove noncompliant improvements, this Court and others have held that injunctive relief ordering removal of the improvements was required, especially in cases in which a party continues to incur building costs after receiving actual or constructive notice of a deed restriction prohibiting construction.[17] *See, e.g.*, *Bollier v. Austin Gurdwara Sahib, Inc.*, Nos. 03-09-00313-CV, 03-09-00317-CV, 2010 WL 2698765, at *8 (Tex. App.—Austin July 9, 2010, pet. denied) (mem. op.) (remanding for entry of injunction ordering removal of completed building that cost $150,000); *Jim Rutherford Invs.*, 25 S.W.3d at 849 (holding that equities did not favor builder who refused to halt construction after being informed of deed restrictions); *Gigowski*, 718 S.W.2d at 22 (ordering appellants to remove mobile home despite "considerable expense" when they had actual and constructive notice of deed restrictions). Because we conclude that the trial court did not err by granting the permanent injunction ordering Park to install windows in compliance with the approved plans, we overrule Park's fifth issue.

---

[17] To the extent that Park argues that he acted in good-faith reliance on his builder's reasonable belief that the windows satisfied the requirements, we note that his good-faith belief that his windows were compliant is irrelevant. *See Jennings v. Bindseil*, 258 S.W.3d 190, 198 (Tex. App.—Austin 2008, no pet.). Park is bound by restrictive covenants of which he has notice, regardless of whether he believed that his actions violated the restrictions. *See id.*

44

Having overruled all of Park's issues against the Association, we will affirm in part the trial court's final judgment granting injunctive relief, attorneys' fees, interest, and costs to the Association and declaring that Park take nothing on his counterclaims against it.

**Issues presented against the judgment in favor of Rostrata Builders**

Having affirmed the portion of the judgment ruling in the Association's favor, we must now consider whether Park should have been allowed to pursue his third-party claim against Rostrata Builders. Park filed a third-party complaint against Rostrata a little more than three months before the Association's case was set for trial, after the case had been on file for almost two years.[18] Park asserted a breach-of-contract claim, alleging that under the contract Rostrata was required to construct and complete the project "in substantial conformance with the Owner's plans ("Drawings") and written specification ("Specification") and any applicable covenants, conditions, and restrictions governing the Property." He further alleged that (1) the Association asserts that the installed windows violate the covenants, conditions, and restrictions governing the property, and (2) Rostrata had the professional duty to consult with the Committee to ensure that the installed windows satisfied the Guidelines. Park sought damages against Rostrata "if [the Association] recovers against Saung Park any judgment . . . for all such costs since the breach of construction contract is the sole cause of [the Association's] request for injunctive relief." Rostrata filed special exceptions, arguing that Park's complaint failed to state a viable cause of action because Texas does not recognize a cause of action for contribution arising out of a breach-of-contract claim. After a hearing, the trial court sustained Rostrata's special exceptions and dismissed Park's claims against it with prejudice.

---

[18] Although Park was represented by an attorney at trial in connection with the Association's claims against him, he filed his complaint against Rostrata pro se.

In his motion for new trial and in his sixth and seventh issues on appeal, Park contends that the trial court erred by granting Rostrata's special exceptions and by dismissing his claims with prejudice and without leave to amend. We review a trial court's order sustaining special exceptions for abuse of discretion. *See Perry v. Cohen*, 285 S.W.3d 137, 142 (Tex. App.—Austin 2009, pet. denied). The trial court has broad discretion when granting special exceptions to order more definite pleadings as a particular case may require. *Id.* A trial court abuses its discretion when it acts without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985).

Rostrata asserted in its special exceptions that Park sought only contribution for his breach-of-contract claim and that contribution claims are limited to causes of action "based on tort." *See* Tex. Civ. Prac. & Rem. Code § 33.002. Rostrata further argued that it could not be liable to Park for contribution because Texas law allows contribution only among joint tortfeasors, relying on *CBI NA-CON, Inc. v. UOP Inc.*, 961 S.W.2d 336, 339-41 (Tex. App.—Houston [1st Dist.] 1998, pet. denied). Park would only have a right to seek contribution against Rostrata if Rostrata had some real or potential liability in damages to the Association. *See id.* at 339 (citing Tex. Civ. Prac. & Rem. Code § 33.016(a)). Park did not allege that the Association had a common-law negligence claim against Rostrata. The Association sought injunctive relief and statutory damages against Park, which were related only to his violation of the restrictive covenants. Thus, the damages that the Association sought from Park, which Park in turn sought as contribution from Rostrata, concern "the subject of the contract itself." *See Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986); *see also CBI NA-CON*, 961 S.W.2d at 339-40 (concluding that defendant seeking contribution from third party could not seek contribution when plaintiff's claim against defendant

46

sounded in contract, not tort, and when plaintiff's claims against third party would also be limited to breach of contract). When a party claims only economic injury to the subject matter of the contract itself, the action sounds in contract, not tort. *Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494-95 (Tex. 1991). In other words, Park's complaint presented a claim for Rostrata's breach of his contract with it (based in turn on the Association's claim that Park violated restrictive covenants) but sought a remedy allowed only for a tort claim. Consequently, we conclude the trial court did not abuse its discretion by sustaining Rostrata's special exceptions. We overrule Park's sixth issue.

We next turn to the question of whether the trial court erred by dismissing Park's claims against Rostrata with prejudice. *See Ford v. Performance Aircraft Servs., Inc.*, 178 S.W.3d 330, 334 (Tex. App.—Fort Worth 2005, pet. denied). When the trial court sustains special exceptions, if the defect is curable, it must give the pleader an opportunity to amend the pleading. *Parker v. Barefield*, 206 S.W.3d 119, 120 (Tex. 2006) (per curiam); *Friesenhahn v. Ryan*, 960 S.W.2d 656 (Tex. 1998). On appeal, Rostrata agrees that Park's claims against it should have been dismissed without prejudice, and it does not oppose reversal of the trial court's dismissal with prejudice. Instead, it argues that the trial court properly dismissed Park's claims because he made no attempt to amend his pleading or respond to Rostrata's special exceptions, but that the dismissal should have been without prejudice. *See Hajdik v. Wingate*, 753 S.W.2d 199, 202 (Tex. App.—Houston [1st Dist.] 1988), *aff'd*, 795 S.W.2d 717 (Tex. 1990). Alternatively, Rostrata requests that Park be required to replead his claims against Rostrata to cure the defects pointed out in Rostrata's special exceptions.

Although Park did not seek leave to amend before the trial court issued its final judgment, he did argue in his motion for new trial that he should have been given the opportunity

47

to amend. *See Inglish v. Prudential Ins. Co. of Am.*, 928 S.W.2d 702, 705 (Tex. App.—Houston [1st Dist.] 1996, writ denied) (explaining that before party may complain about denial of opportunity to amend after special exceptions were sustained, it must demonstrate that such an opportunity was requested and denied). We conclude that the trial court should have granted Park leave to amend his complaint against Rostrata. We sustain Park's seventh issue. As a result, we will reverse the portion of the trial court's judgment dismissing Park's claims against Rostrata with prejudice and will remand the case to the trial court to allow Park to replead to cure the defects in his complaint against Rostrata.

## CONCLUSION

We affirm the portion of the trial court's final judgment granting injunctive relief, attorneys' fees, interest, and costs to the Association and declaring that Park take nothing on his counterclaims against the Association. We reverse the portion of the trial court's judgment dismissing Park's claims against Rostrata with prejudice and remand the case to the trial court to allow Park to replead to cure the defects in his complaint against Rostrata.

_____

David Puryear, Justice

Before Chief Justice Rose and Justices Puryear and Pemberton

Affirmed in Part; Reversed and Remanded in Part

Filed:   February13, 2015