**Motion for Reconsideration En Banc Granted; Opinion and Judgment of December 27, 2018, Withdrawn; Affirmed; and Opinion on Reconsideration En Banc, Concurring Opinion on Reconsideration En Banc, and Dissenting Opinion on Reconsideration En Banc filed August 13, 2019.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-17-00982-CV

---

## CHENIERE ENERGY, INC. AND CHENIERE LNG TERMINALS, LLC, Appellants

### V.

## PARALLAX ENTERPRISES LLC, PARALLAX ENERGY LLC, PARALLAX ENTERPRISES (NOLA) LLC, LIVE OAK LNG LLC, LIVE OAK LNG PIPELINE LLC, MOSS LAKE LNG LLC, LOUISIANA LNG ENERGY, LLC, AND CALCASIEU LNG LLC, Appellees

---

### On Appeal from the 61st District Court
### Harris County, Texas
### Trial Court Cause No. 2017-49685

---

# OPINION ON RECONSIDERATION EN BANC

We grant the appellees' motion for reconsideration en banc, withdraw our opinion and judgment of December 27, 2018, and substitute the opinion and judgment of this date.

This is an interlocutory appeal from a temporary injunction preventing appellants Cheniere Energy, Inc. ("Cheniere Energy") and Cheniere LNG Terminals, LLC ("Cheniere Terminals") (collectively, "the Cheniere Parties") from non-judicially foreclosing on the equity interests of appellee Parallax Enterprises LLC ("Parallax") in its wholly owned subsidiary, appellee Live Oak LNG LLC ("Live Oak"). In our original memorandum opinion, we reversed the trial court's grant of injunctive relief and remanded the case for further proceedings. We grant the appellees' motion for reconsideration en banc, withdraw our opinion and judgment of December 27, 2018, and affirm the trial court's ruling.

## I. BACKGROUND

The underlying dispute involves an alleged failed attempt by the Cheniere Parties and several Parallax-related entities[1] (collectively, "the Parallax Parties") to jointly develop two mid-scale liquefied natural gas ("LNG") facilities in Louisiana: Live Oak and the Louisiana LNG project. The Parallax Parties allege that they reached an agreement with the Cheniere Parties on all material terms for an "expanded joint development agreement, business association, and venture" to develop the two facilities.

The alleged venture changed over time. According to the Parallax Parties, the parties initially agreed Parallax Enterprises would take the leading role in developing

---

[1] The Parallax-related entities involved in this dispute include appellees Parallax Energy LLC, Parallax Enterprises LLC, Parallax Enterprises (NOLA) LLC, Live Oak LNG LLC, Live Oak LNG Pipeline LLC, Moss Lake LNG LLC, Louisiana LNG Energy, LLC, and Calcasieu LNG LLC.

2

the facilities, and the Cheniere Parties would provide funding of $120–130 million to develop the projects. The parties originally proposed equal co-ownership of the projects, but later proposed that the Parallax Parties develop the projects to the "investment-ready" point of construction, at which time the Cheniere Parties would pay the Parallax Parties a success fee and assume ownership.

The Parallax Parties allege that while the parties were working on the written terms of a final agreement, the Parallax Parties began incurring expenses to develop the projects. To obtain the funds to pay vendors in advance of a signed joint-venture agreement, Parallax signed a Secured Promissory Note which subsequently was amended several times. The Note was guaranteed by six of Parallax's wholly owned subsidiaries, including Live Oak. The Parallax Parties contend they signed the Note only to satisfy the Cheniere Parties' internal accounting department, and that all parties always intended the money to be considered a capital contribution—or equity—in the joint projects rather than a loan that had to be repaid. The Cheniere Parties additionally paid at least one of the vendors directly. The Cheniere Parties maintain the parties never reached a final agreement on the joint development of the projects and that the funds were advanced only as a short-term loan pursuant to the express terms of the Note. At the time they signed the Note, the Parallax Parties were not capitalized and had no assets or means to repay a loan.

Before the parties finalized the written terms of their agreement, the Cheniere Parties stopped funding the projects and demanded repayment of the $46 million paid under the Note. The Parallax Parties refused repayment, contending that the $46 million advanced under the Note was not debt but a capital contribution and that additional funds were due from the Cheniere Parties. Although the parties had not finalized a written agreement, the Parallax Parties contend that they proceeded to develop the project and incurred expenses—including the execution of the Note—

3

based on the Cheniere Parties' assurances that the advanced funds would be considered equity and not debt. Live Oak alleged that it incurred substantial liabilities to third parties, though it has no assets to pay the debts. The Parallax Parties ceased development of the two projects and were left owing $10 million in debt to third parties.

The Parallax Parties—including Live Oak—sued the Cheniere Parties, alleging claims for breach of contract, breach of fiduciary duties, promissory estoppel, quantum meruit, and fraudulent inducement of the Note. The Parallax Parties also sought declaratory relief that the Note constitutes equity rather than debt, and that the Note lacks an enforceable security interest.

The Cheniere Parties counterclaimed, asserting the right to repayment of $46 million under the Note and bringing third-party claims against four individual defendants and four entities affiliated with those defendants. In addition, Cheniere Terminals served notice that it intended to non-judicially foreclose on all of Parallax's equity interest in Live Oak. The Cheniere Parties contend that Parallax's interest in Live Oak was included as collateral securing the Note.

In response, the Parallax Parties sought injunctive relief to prevent Cheniere from: (a) foreclosing on Parallax's interest in Live Oak; (b) interfering with or attempting to control the management, governance, or operation of any of the Parallax Parties; and (c) otherwise disrupting the normal course of business of any of the Parallax Parties. The Parallax Parties also asserted that their rights under the Note are the subject of the lawsuit and that allowing Cheniere Terminals to foreclose would undermine the trial court's jurisdiction because it would allow the Cheniere Parties a "self-help remedy" without proving any of their claims. The Parallax Parties maintain that the debt is not valid or enforceable, and that in any event, the

Cheniere Parties do not have an enforceable security interest in Parallax's equity interest in Live Oak.

After an evidentiary hearing, the trial court granted the requested injunctive relief. The trial court's order states in pertinent part as follows:

> [T]he Court finds and holds that [the Parallax Parties] have demonstrated claims against [the Cheniere Parties]; have shown a likelihood of success on the merits of their claims; and, absent injunctive relief, will suffer imminent irreparable injury by, including but not limited to, losing ownership and control over assets, including the limited liability company interest of [Live Oak], the rights to which are the subject of the parties' claims in this action, and through which claims are made by [the Parallax Parties] against [the Cheniere Parties]. Absent injunctive relief, [the Parallax Parties] also will be forced to defend their right to control claims made against [the Cheniere Parties], including defending against attempted dismissal of legal claims that [the Parallax Parties] make against [the Cheniere Parties] and with regard to claims that [the Cheniere Parties] state they intend to assert through ownership of the limited liability company interest in [Live Oak]. The Court finds that an injunction is necessary to avoid a party performing an act relating to the subject of the pending litigation, in violation of the rights of the applicant, and that the act would tend to render the judgment in the litigation ineffectual. As such, [the Parallax Parties] have established a right to injunctive relief pursuant to Tex. R. Civ. P. 683 and Tex. Civ. Prac. & Rem. Code §§ 65.011(1) and (2), and their application should be GRANTED.

Pursuant to the terms of the injunction order, the Parallax Parties posted a cash deposit in lieu of bond. This appeal followed.

## II. ISSUES PRESENTED

In four issues, the Cheniere Parties ask us to reverse and render judgment denying the Parallax Parties' application for temporary injunction because (a) Cheniere Terminals has an express contractual right under the Note to foreclose on Parallax's equity interest in Live Oak; (b) Parallax failed to prove it faces

5

imminent, irreparable harm for which it lacks an adequate remedy at law; (c) Parallax failed to prove a probable right to relief; and (d) Parallax failed to show that its entitlement to a temporary injunction under Texas Civil Practice and Remedies Code section 65.011. In a fifth issue, the Cheniere Parties contend that the trial court erred in excluding evidence relevant to "unclean hands," and they ask us to reverse the trial court's order granting the Parallax Parties' requested temporary injunction and to remand for a new evidentiary hearing.

### III. TEMPORARY INJUNCTIVE RELIEF

The purpose of a temporary injunction is to preserve the status quo of the subject matter of the litigation pending a trial on the merits. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). A temporary injunction is an extraordinary remedy and does not issue as a matter of right. *Id.* To obtain a temporary injunction under equitable principles, the applicant must plead and prove (1) a claim against the defendant, (2) a probable right to the relief sought, and (3) a probable, imminent, and irreparable injury in the interim. *Id.*; *Hsin-Chi-Su v. Vantage Drilling Co.*, 474 S.W.3d 284, 295 (Tex. App.—Houston [14th Dist.] 2015, pet. denied). These equitable elements of injunctive relief likewise apply to a request for injunctive relief under section 65.011 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE § 65.001 ("The principles governing courts of equity govern injunction proceedings if not in conflict with this chapter or other law."); *Town of Palm Valley v. Johnson*, 87 S.W.3d 110, 111 (Tex. 2001) (per curiam) (applying irreparable-harm element to application under Section 65.011(1)); *City of El Paso v. Caples Land Co., LLC*, 408 S.W.3d 26, 37 (Tex. App.—El Paso 2013, pet. denied) (stating applicant must establish both probable right to relief and irreparable injury in addition to showing required by Section 65.011(2)).

6

To show a probable right to relief on a claim, the applicant is not required to establish that it will prevail at trial on the merits. *Hsin-Chi-Su*, 474 S.W.3d at 295. With regard to imminent and irreparable injury in the interim, an injury is considered irreparable if the party cannot be adequately compensated in damages or if those damages are incapable of calculation. *See Butnaru*, 84 S.W.3d at 204; *N. Cypress Med. Ctr. Operating Co., Ltd. v. St. Laurent*, 296 S.W.3d 171, 175 (Tex. App.—Houston [14th Dist.] 2009, no pet.). An adequate remedy at law is one that is "as complete, practical, and efficient to the prompt administration of justice as is equitable relief." *Tex. Black Iron, Inc. v. Arawak Energy Int'l Ltd.*, 527 S.W.3d 579, 584 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

Money damages are generally adequate to compensate an injured party unless the loss at issue is considered "legally 'unique' or irreplaceable." *St. Laurent*, 296 S.W.3d at 175. Thus, trial courts grant injunctive relief in foreclosure actions involving real property because real estate is generally considered unique. *See Butanaru*, 84 S.W.3d at 211 (equitable relief available in disputes involves real property); *Pinnacle Premier Props., Inc. v. Breton*, 447 S.W.3d 558 565 n.10 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (real estate generally considered unique). "In a temporary-injunction hearing, the burden is on the applicant to prove that his damages cannot be calculated, not on the non-movant to *dis*prove that notion." *St. Laurent*, 296 S.W.3d at 177 (emphasis in original).

We review a trial court's order granting temporary injunctive relief for a clear abuse of discretion. *Henry v. Cox*, 520 S.W.3d 28, 33 (Tex. 2017). In reviewing the order, we view the evidence in the light most favorable to the trial court's ruling, indulging every reasonable inference in its favor. *LasikPlus of Tex., P.C. v. Mattioli*, 418 S.W.3d 210, 216 (Tex. App.—Houston [14th Dist.] 2013, no pet.). We do not review or decide the underlying merits of the case, but instead limit our review to

7

the validity of the order. *Henry*, 520 S.W.3d at 33–34. The trial court does not abuse its discretion if some evidence reasonably supports its ruling. *Id.* at 34. A trial court abuses its discretion if it misapplies the law to the established facts of the case. *Tex. Black Iron, Inc.*, 527 S.W.3d at 584.

## A.    Probable Right to Relief

The Cheniere Parties argue in their first issue that Cheniere Terminals has an express contractual right under the Note to foreclose on Parallax's equity interest in Live Oak, and our resolution of this issue also disposes of their third issue and the portion of their fourth issue in which they argue that the Parallax Parties failed to show a probable right to relief. For the reasons set forth below, we conclude that the Note does not give the Cheniere Parties the express contractual right to foreclose on Parallax's equity interest in Live Oak, and thus, the Parallax Parties demonstrated a probable right to relief on their request for a declaration that the Cheniere Parties do not have an enforceable security interest in the property. Because the Parallax Parties demonstrated a probable right to relief on their declaratory-judgment claim, we need not consider whether the Parallax Parties demonstrated a probable right to relief on their remaining claims.

To understand why the Note does not confer the right to foreclose on Parallax's equity interest, it first is necessary to understand when a security interest attaches to collateral. Under the Uniform Commercial Code, and with an exception inapplicable here, a security interest attaches to collateral when the interest in the collateral becomes enforceable against the debtor. *See* TEX. BUS. & COM. CODE ANN. § 9.203(a). A security interest in collateral is enforceable against a debtor if (1) value has been given, (2) the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party, and (3) one of four other conditions is met. *See id*. § 9.203(b). Of those four other conditions, only one is potentially applicable

8

to this case: "the debtor has authenticated a security agreement that provides a description of the collateral." *Id.* § 9.203(b)(3)(A).

As applicable here, the statutory requirements for describing the collateral in a secured transaction are as follows:

(a)     Except as otherwise provided in Subsection[] (c) . . . , a description of personal or real property is sufficient, whether or not it is specific, if it reasonably identifies what is described.

(b)     . . . [A] description of collateral reasonably identifies the collateral if it identifies the collateral by:

(1)     specific listing;

(2)     category;

(3)     except as otherwise provided in Subsection (e), a type of collateral defined in this title;

. . .

(6)     except as otherwise provided in Subsection (c), any other method, if the identity of the collateral is objectively determinable.

(c)     A description of collateral as "all the debtor's assets" or "all the debtor's personal property" or using words of similar import does not reasonably identify the collateral. . . .

. . .

(e)     A description only by type of collateral defined in this title is an insufficient description of:

(1) a commercial tort claim . . . .

*Id.* § 9.108(a)–(c), (e). Under the UCC, then, a security interest attaches to reasonably identified collateral, and a "super generic" description does not reasonably identify collateral. *See* TEX. BUS. & COM. CODE ANN. § 9.101, cmt. 4(h) ("[A] super-generic description is inadequate for purposes of a security agreement.").

9

### 1. Parallax's equity interest in Live Oak is not among the reasonably identified collateral.

The Parallax Parties contend that the Note's description of the collateral does not reasonably identify Parallax's equity interest in Live Oak. We agree.

The Note defines the "Loan Parties" as the Note's maker Parallax and loan guarantors Live Oak, Parallax Enterprises (NOLA) LLC, Live Oak LNG Pipeline LLC, Moss Lake LNG LLC, Louisiana LNG Energy, LLC, and Calcasieu LNG LLC. The Note then describes the collateral securing the loan as follows:

Description of the Property

All of Loan Party's right, title and interest in and to the following, whether now owned or hereafter acquired by such Loan Party and whether now existing or in the future coming into existence:

1.  All deposit, securities and other accounts and investment property
2.  All instruments, documents and chattel paper
3.  All inventory, equipment, fixtures and goods
4.  All contracts and permits
5.  All letter-of-credit rights
6.  All intellectual property
7.  All real property
8.  All other tangible and intangible property and assets of such Loan Party

The Loan Parties' equity interests are not encompassed by items 1–7, and item 8 is a "super generic" catch-all that, as a matter of law, "does not reasonably identify the collateral." *See id.* § 9.108(c) (super-generic language such as "all the debtor's assets" or "all the debtor's personal property" does not reasonably identify collateral). Indeed, the description "all other tangible and intangible property and assets" of the Note's maker and its six guarantors is far broader than the statute's examples of descriptions that are inadequate to allow a security interest to attach.

10

*See id.* Because "[a] proper security agreement is a requisite for attachment of the security interest"[2] and the security agreement does not reasonably identify as collateral Parallax's equity interests in any subsidiary, no security interest attached to Parallax's equity in Live Oak. Thus, the Parallax Parties have shown both that (a) the Note does not give the Cheniere Parties a contractual right to non-judicially foreclose on Parallax's equity in Live Oak, and (b) the Parallax Parties have a probable right to the requested declaration that the Cheniere Parties do not have a security interest in Parallax's equity interest in Live Oak.

### 2. *"Intangible property" is not the same as "general intangibles."*

The Cheniere Parties contend that "all other . . . intangible property" includes equity because the Uniform Commercial Code defines "general intangibles" to mean "any personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas, or other minerals before extraction. The term includes payment intangibles and software." *Id.* § 9.102(a)(42). We agree that Parallax's equity in Live Oak is a "general intangible" as defined in the UCC, so if the Note had listed "general intangibles" among the collateral, this would have been sufficient for a security interest to attach because the UCC states that a "description of collateral reasonably identifies the collateral if it identifies the collateral by . . . a type of collateral *defined in this title*." *Id.* § 9.108(b)(3) (emphasis added); *see also In re Barr*, 180 B.R. 156, 159 (Bankr. N.D. Tex. 1995) (agreement giving party a secured interest in collateral

---

[2] *Carmel Fin. Corp. v. Castro*, 514 S.W.3d 291, 296 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (quoting *Villa v. Alvarado State Bank*, 611 S.W.2d 483, 487 (Tex. App.—Waco 1981, no writ)).

described as "general intangibles" was sufficient to give the party a secured interest in capital credits).

But the Note instead refers to "intangible property," which is not a term defined in the UCC. Moreover, "intangible property" is broader than "general intangibles," for it includes intangibles that are specifically excepted from the definition of "general intangibles." *See, e.g.*, TEX. BUS. & COM. CODE ANN. § 9.108(e)(1) ("general intangibles" is an insufficient description to encompass commercial tort claims); *Bray v. Cadle Co.*, 880 S.W.2d 813, 816 (Tex. App.—Houston [14th Dist.] 1994, writ denied) (promissory note is "intangible collateral" but not a "general intangible" as defined by the UCC).

The Cheniere Parties argue that it does not matter that the Note did not use the exact phrase "general intangibles," but in the case it cites as support for that position, the collateral described was a subset of "general intangibles." *See In re ProvideRx of Grapevine, LLC*, 507 B.R. 132, 162 (Bankr. N.D. Tex. 2014). The *ProvideRx* court reasoned that "because the broader 'catch-all' of general intangibles would have been a statutorily sufficient collateral description, the subset of general intangibles referred to as intellectual property assets (IP assets) is also sufficient."[3] *Id.* Thus, under *ProvideRx*, a description of collateral is sufficient if it is a subset of items wholly encompassed by a defined term.

---

[3] Our analysis is unaffected by the Cheniere Parties' citations to cases discussing collateral consisting solely of tangible property or in which the collateral is described by the defined term "general intangibles." *See, e.g.*, *Orix Credit Alliance, Inc. v. Omnibank, N.A.*, 858 S.W.2d 586, 591 (Tex. App.—Houston [14th Dist.] 1993, writ dism'd) ("[T]he description contained in the security agreement, clearly referring to tangible property, did not describe or identify the collateral at issue here, intangible property."); *Unicut, Inc. v. Tex. Commerce Bank-Chem.*, 704 S.W.2d 442, 444 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.) (holding that inventory is included in collateral description, "[a]ll goods, merchandise, raw material, goods in process, finished goods, and other tangible personal property of whatever nature now owned by Debtor or hereafter acquired, and held for sale or lease or furnished or to be furnished under contracts of service or used or consumed in Debtor's business").

12

Here, however, the situation is reversed because "all intangible property" is broader than "general intangibles." The Cheniere Parties appear to tacitly acknowledge this by stating "the Secured Note leaves no doubt that its collateral description *encompasses* all general intangibles."[4] But the question is whether the description reasonably identifies the collateral, not whether the description "encompasses" the collateral. If it were sufficient to say that the description *encompasses* the collateral at issue, then the UCC would not state that super-generic descriptions such as "all the debtor's assets" or "all the debtor's personal property"—both of which encompass all general intangibles—do not reasonably identify collateral. The description used by the Cheniere Parties is such a super-generic description.

### 3. *Parallax's awareness that the Cheniere Parties intended to create a security interest in Parallax's equity in Live Oak is no substitute for a sufficient description.*

The Cheniere Parties also urge us to consider that the only property Parallax has ever owned is its interest in Live Oak, and thus, Parallax knew that its equity interest in Live Oak was included in the collateral. In support of this proposition, the Cheniere Parties cite *River Oaks Chrysler-Plymouth, Inc. v. Barfield*, 482 S.W.2d 925 (Tex. App.—Houston [14th Dist.] 1972, writ dism'd). In that case, a "Customer Repair Order" created a security interest in a vehicle to be repaired. *See id.* at 927. We concluded that the description of the vehicle—which included its make, model, year, speedometer reading, and license number—was sufficient to satisfy the UCC's requirements. The Cheniere Parties rely on our statement,

> This is particularly so in light of the fact that the current dispute is between the creditor and debtor, not between the creditor and a third party. The debtor is fully aware of what collateral is concerned and does

---

[4] Emphasis added.

13

> not need any information in addition to that found in the work order in order to identify the car.

*Id.* at 928. The Cheniere Parties' reliance on this language is misplaced for several reasons.

When *River Oaks Chrysler-Plymouth* was decided in 1972, the Texas UCC provision concerning the sufficiency of the description of collateral stated only, "For the purposes of this chapter any description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described." Act of May 25, 1967, 60th Leg., ch. 785, § 1, sec. 9-110, 1967 TEX. GEN. LAWS 2343, 2526. But the bar to super-generic descriptions was not added until 1999. *See* Act of May 17, 1999, 76th Leg., R.S., ch. 414, § 1.01, sec. 9.108, 1999 TEX. GEN. LAWS 2639, 2655–56. Moreover, the description of the vehicle in *River Oaks Chrysler-Plymouth* is not super-generic and would be sufficient even under the current version of the UCC. Finally, the language on which the Cheniere Parties rely does not suggest that a debtor's awareness of the creditor's *intent* to create a security interest in particular property is a substitute for a description reasonably identifying the property. To the contrary, we stated that the debtor needed no information "in addition to" the statutorily sufficient description in the repair order.

### 4. *The description of collateral does not incorporate the organizational chart attached to the Note.*

The Cheniere Parties additionally contend that the description "all intangible property" reasonably identifies Parallax's equity interest in Live Oak because a chart of the "corporate and organizational structure of the Loan Parties" is attached to, and referred to within, the Note. But, the sole reference to the chart is this:

> 4.1 <u>Representations and Warranties</u>. Each Loan Party represents and warrants to Payee as of the date hereof as follows:
>
> . . .

14

(h)     The corporate and organizational structure of the Loan Parties is set forth on Schedule 4.1(h). Except as set forth on Schedule 4.1(h), such Loan Party has no subsidiaries.

The description of the collateral does not refer to the chart or to any subsidiary of any Loan Party, and the Note's language shows that the chart's purpose was to show the corporate and organizational structure of the "Loan Parties," not to identify collateral. This is further demonstrated by the chart itself, which includes three companies that are not among the listed "Loan Parties," and at least two of those three additional companies could not have been included among the collateral because no Loan Party owned any interest in them.

**5.    *A contractual waiver provision does not expand the Note's reasonably identified collateral.***

In addressing the Parallax Parties' allegations of fraudulent inducement and requests to recharacterize as equity the debt evidenced by the Note, the Cheniere Parties contend that the Parallax Parties have contractually waived "any cause of action that supposedly affords Parallax a right to avoid enforcement of the Secured Note." For the sake of completeness, we will assume that the Cheniere Parties include in this argument the contention that the Parallax Parties have contractually waived their request for a declaration that the Cheniere Parties do not have an enforceable security interest "in any limited liability company interests" held by Parallax or its subsidiaries.

The waiver provision on which the Cheniere Parties rely is as follows:[5]

7.2 <u>Certain Waivers</u>. All parties now and hereafter liable with respect to this Secured Note . . . hereby waive, to the fullest extent permitted by applicable law: . . . (C) defenses based on disability or lack of authority of any Loan Party, failure by Payee to enforce any claim

---

[5] Full capitalization omitted for readability.

against any Loan Party or the invalidity or unenforceability, in whole or in part, of any Transaction Document . . . .[6]

This language purports to waive defenses to enforcement of the rights that the Note confers, but the Note does not confer the right to foreclose on property to which no security interest has attached. Because a security interest attaches only to reasonably identified collateral and the Note does not reasonably identify Parallax's equity interest in its subsidiaries as collateral, the Parallax Parties have made the required showing that the Cheniere Parties do not have a security interest in Parallax's equity in Live Oak.[7]

We overrule the Cheniere Parties' first and third issues, as well as the portion of their fourth issue in which they argue that all claims on which Parallax predicated its application for temporary injunction fail as a matter of law.

## B. Probable Imminent, Irreparable Harm with No Adequate Remedy at Law

In their second issue, the Cheniere Parties contend that the Parallax Parties failed to prove they face imminent, irreparable harm for which they lack an adequate remedy at law, because (1) Parallax judicially admitted that Live Oak is insolvent and has no assets other than the claims in this case; (2) Parallax's pleadings establish that Live Oak has no legitimate claims against the Cheniere Parties that would be

---

[6] "Transaction Documents" are defined to include the Note.

[7] We do not consider the waiver to be ambiguous, but even if it were, the principle of *ejusdem generis* would dictate the same result. This doctrine "applies when words of a specific and particular meaning are followed by general words and when an ambiguity exists." *City of Corpus Christi v. Bayfront Assocs., Ltd.*, 814 S.W.2d 98, 104 (Tex. App.—Corpus Christi 1991, writ denied). Under this canon of construction, "when words of a general nature are used in connection with the designation of particular objects or classes of persons or things, the meaning of the general words will be restricted to the particular designation." *State v. Fid. & Deposit Co. of Maryland*, 223 S.W.3d 309, 312 (Tex. 2007) (per curiam) (quoting *Hilco Elec. Coop. v. Midlothian Butane Gas Co.*, 111 S.W.3d 75, 81 (Tex. 2003)). In section 7.2(C) of the note, all of the matters preceding the broad reference to "invalidity and unenforceability" are affirmative defenses.

16

lost as a result of the foreclosure inasmuch as all of the claims are predicated on an allegedly failed partnership agreement to which Live Oak is not alleged to have been a party; and (3) any alleged injury to Parallax from the loss of Live Oak's claims is quantifiable in damages.

The Cheniere Parties point out that the Parallax Parties emphasized in the trial court that Live Oak is a Delaware limited liability company, and its limited liability company agreement is governed by Delaware law. The Parallax Parties further maintained in the trial court that even if the Cheniere Parties were to foreclose on Parallax's equity interest in Live Oak, the Cheniere Parties would not be able to exercise management and control over the company. *See* DEL. CODE ANN. tit. 6, § 18-702(b)(1) ("An assignment of a limited liability company interest does not entitle the assignee to become or to exercise any rights or powers of a member . . . ."); *id.* § 18-704(a)(3) (a person to whom the company's sole member voluntarily assigns all of its interests in the company can become a member, but not if the assignment is accomplished "by foreclosure or other similar legal process"). Although the Cheniere Parties assert that foreclosure will allow them to exercise control over Live Oak, they contend that a court might agree with the Parallax Parties, and given that possibility, the Parallax Parties cannot show probable imminent, irreparable harm.

But the Parallax Parties face harm from the threatened foreclosure even if the Cheniere Parties would not benefit from it. Under Delaware law, foreclosure might not make the Cheniere Parties members in the company or entitle them to exercise the powers of a member—but it would make Parallax *cease* to be a member. *See id.* § 18-702(b)(3) ("Unless otherwise provided in a limited liability company agreement . . . [a] member ceases to be a member and to have the power to exercise any rights or powers of a member upon assignment of all of the member's limited

17

liability company interest."). Further, a Delaware limited liability company is automatically dissolved when there are no members, *see id.* § 18-801(a)(4), and Live Oak certainly would be harmed by its own dissolution. *See Frontera Generation Ltd. P'ship v. Mission Pipeline Co.*, 400 S.W.3d 102, 111 (Tex. App.—Corpus Christi–Edinburg 2012, orig. proceeding) (foreclosure that would "dissolve the company" constitutes probable imminent, irreparable injury); *cf. Trinity Water Reserve, Inc. v. Evans*, 829 S.W.2d 851, 865–66 (Tex. App.—Beaumont 1992, no writ) (upholding injunction necessary to prevent party from being forced into bankruptcy).[8]

We acknowledge that Delaware law provides at least two ways to "revoke the dissolution." *See In re Modanlo*, 412 B.R. 715, 723–24 (Bankr. D. Md. 2006), *aff'd*, 266 Fed. Appx. 272 (4th Cir. 2008). First, the limited liability company is not dissolved if, within ninety days after the company ceases to have any members, "the personal representative of the last remaining member agrees to continue the limited liability company and to the admission of the personal representative of such member or its nominee or designee to the limited liability company as a member." DEL. CODE ANN. tit. 6, § 18-801(a)(4)(a). Moreover, a limited liability company agreement can require the personal representative to agree to continue the company and to be admitted as a member. But Live Oak's limited liability company agreement does not require Parallax's personal representative to agree to either of these conditions. Second, a limited liability company agreement may specifically provide for the admission of a member after there is no longer a remaining member. *Id.* § 18-801(a)(4)(b). But here, too, Live Oak's limited liability company agreement does not contain such a provision.

---

[8] We note that under Delaware law, foreclosure would allow the Cheniere Parties to assert certain derivative claims even without gaining control of the company. *See* DEL. CODE ANN. tit. 6, § 18-1002. Thus far, however, their threatened claims are against third-party defendants, not against any of the Parallax Parties.

Even if Live Oak were to continue in existence by the appointment of a new member after foreclosure, Parallax would be irreparably harmed by the loss of its right to manage and control the company. For example, Live Oak's limited liability company agreement provides that the company's management is "exclusively vested in the Sole Member," and that only the Sole Member may amend the company agreement. But if the Cheniere Parties foreclose on Parallax's equity interest in Live Oak, Parallax will no longer be a member, and would lose these rights. The loss of management rights over a company are unique, irreplaceable, and "cannot be measured by any certain pecuniary standard." *Sonwalkar v. St. Luke's Sugar Land P'ship, L.L.P.*, 394 S.W.3d 186, 201 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (quoting *Butnaru*, 84 S.W.3d at 204).[9]

For all of these reasons, we conclude on reconsideration en banc that the trial court did not abuse its discretion in concluding that the Parallax Parties made a sufficient showing that, absent injunctive relief, they face probable imminent, irreparable harm for which there is no adequate remedy at law. Thus, we overrule the Cheniere Parties' second issue and the part of their fourth issue in which they argue that the Parallax Parties failed to establish that, absent temporary injunctive relief, the Parallax Parties face imminent, irreparable injury for which there is no adequate remedy at law.

---

[9] In our original panel opinion, we distinguished *Sonwalkar* on the ground that, unlike Live Oak, the company at issue in that case had ongoing operations. Although our sister court noted that "a trial court may grant injunctive relief when the enjoined conduct threatens to disrupt an ongoing business, *Sonwalkar*, 394 S.W.3d at 199, the court did not discuss whether such a disruption was probable absent injunctive relief. The court instead agreed with the injunction applicants that "rights to participate in the management and control of a partnership are unique, and no adequate remedy at law exists for depriving Plaintiffs of that right." *See id.* at 201. The same reasoning applies here.

## C. Relief Under Texas Civil Practice and Remedies Code Section 65.011

In its order, the trial court stated that the Parallax Parties established a right to relief under Texas Civil Practice and Remedies Code sections 65.011(1) and (2), which provide as follows:

A writ of injunction may be granted if:

(1)   the applicant is entitled to the relief demanded and all or part of the relief requires the restraint of some act prejudicial to the applicant;

(2)   a party performs or is about to perform or is procuring or allowing the performance of an act relating to the subject of pending litigation, in violation of the rights of the applicant, and the act would tend to render the judgment in that litigation ineffectual . . . .

TEX. CIV. PRAC. & REM. CODE ANN. § 65.011(1), (2). In the remainder of their fourth issue, the Cheniere Parties contend that the requirements of neither subsection have been satisfied.

For the reasons previously explained, we conclude that the Parallax Parties established their entitlement to a temporary injunction under section 65.011(1). Thus, we overrule the remainder of the Cheniere Parties' fourth issue without considering whether the Parallax Parties also established their entitlement to a temporary injunction under section 65.011(2).

## D. Excluded Evidence

In their fifth and final issue, the Cheniere Parties argue that the trial court abused its discretion in sustaining objections to certain evidence offered by the Cheniere Parties. We review the exclusion of evidence for abuse of discretion. *JLG Trucking, LLC v. Garza*, 466 S.W.3d 157, 161 (Tex. 2015) (citing *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001) (sub. op. on denial

20

of reh'g)). The erroneous exclusion of evidence is reversible only if it probably resulted in an improper judgment. *Id.*; TEX. R. APP. P. 44.1(a)(1).

### 1. The trial court did not abuse its discretion in sustaining the objections to evidence of "unclean hands."

Under the doctrine of "unclean hands," a court may "refuse to grant equitable relief, such as an injunction, sought by one whose conduct in connection with the same matter or transaction has been unconscientious, unjust, or marked by a want of good faith, or one who has violated the principles of equity and righteous dealing." *Stewart Beach Condo. Homeowners Ass'n, Inc. v. Gili N Prop Invs., LLC*, 481 S.W.3d 336, 351 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (quoting *Park v. Escalera Ranch Owners' Ass'n, Inc.*, 457 S.W.3d 571, 597 (Tex. App.—Austin 2015, no pet.) (alterations in original)). In an attempt to show that the Parallax Parties acted with unclean hands, the Cheniere Parties offered evidence intended to show that the liquefaction projects previously pursued by the Parallax Parties through Live Oak are now being pursued by individual third-party defendants Martin Houston, Christopher Bowen Daniels, Howard Candelet, and Mark Evans, acting through one or more of the third-party defendants Tellurian Investments, Inc., Tellurian Services LLC, Driftwood LNG, LLC, and Driftwood Pipeline, LLC. Counsel for the Tellurian and Driftwood entities objected to the relevancy of the evidence, as did the attorneys for the Parallax Parties as well as an additional attorney representing Live Oak.

The trial court did not abuse its discretion in sustaining the objections. The excluded evidence pertains to the conduct of the individual third-party defendants, none of whom joined in the Parallax Parties' request for a temporary injunction. Moreover, the conduct of the third-party defendants was not "in connection with the same matter or transaction" at issue between the Cheniere Parties and the Parallax Parties. This is true regardless of whether one views "the matter or transaction" as a loan agreement between the Cheniere Parties and the Parallax Parties or as a joint-

development agreement between the Cheniere Parties and Parallax. In either event, none of the third-party defendants were parties to the transaction, nor do the Cheniere Parties contend that they or the Parallax Parties were parties to the transactions among the third-party defendants. For each of these reasons, we affirm the trial court's exclusion of the Cheniere Parties' "unclean hands" evidence.

## 2. *The trial court did not abuse its discretion in excluding evidence of Parallax's pleadings or compromise negotiations in other suits.*

In a footnote under their fifth issue, the Cheniere Parties assert that the trial court erred in excluding two exhibits "relevant both to Parallax's likelihood of success on the merits and the adequacy of its remedy at law in the absence of temporary injunctive relief."

The first exhibit is the petition filed by Parallax in a Louisiana suit against the Cheniere Parties in March 2016; the trial court sustained the relevancy objection to that exhibit. The Cheniere Parties do not explain in their brief, and the evidence does not show, how a pleading filed by one Parallax Party in a case that has since been dismissed is relevant to the eight Parallax Parties' probable right to relief in this case or the adequacy of a remedy at law. At the hearing, the Cheniere Parties' counsel stated that the pleading from the earlier case shows that Parallax sought only money damages. But, that has no bearing on the Parallax Parties' probable right to relief on the live claims in this case. A pleading for money damages in early 2016 also does not show that the Parallax Parties currently have an adequate remedy at law in the absence of injunctive relief. *Cf. Davis v. Upshur Cty.*, 191 S.W.2d 524, 525 (Tex. App.—Texarkana 1945, no writ) (availability of injunctive relief is based on circumstances at the time of the hearing rather than the circumstances that existed when the suit began). The conduct the Parallax Parties sought to enjoin was the Cheniere Parties' non-judicial foreclosure and sale of property in which they claim

22

a security interest, but the Cheniere Parties first notified the Parallax Parties of the planned foreclosure on September 13, 2017—eighteen months after Parallax filed the pleading in the Louisiana case. Once notified of the Cheniere Parties' intent, however, the Parallax Parties promptly sought to enjoin the foreclosure.

The second excluded exhibit is an August 2016 letter from Parallax to Cheniere Terminals (a) concerning the dismissal without prejudice of Parallax's claims then pending against the Cheniere Parties in federal court, and (b) proposing a "mutual step back between our companies." The trial court sustained the objection that the letter was a statement made in compromise negotiations. *See* TEX. R. EVID. 408. The validity of that objection is apparent from the face of the document, and the Cheniere Parties do not argue otherwise on appeal.

Finding no abuse of discretion in the challenged evidentiary rulings, we overrule the Cheniere Parties' fifth issue.

## IV. CONCLUSION

Under the singular facts of this case, we conclude that the trial court did not abuse its discretion in granting a temporary injunction that maintains the status quo, pending litigation of the parties' claims on the merits. We accordingly affirm the trial court's grant of the Parallax Parties' application for a temporary injunction.


/s/ Tracy Christopher
Justice

En banc court consists of Chief Justice Frost and Justices Christopher, Wise, Jewell, Bourliot, Zimmerer, Hassan, and Poissant. (Spain, J., not participating). Justice Christopher authored the Opinion on Reconsideration En Banc, in which Justices Wise, Bourliot, Zimmerer, Hassan, and Poissant joined. Justice Zimmerer authored the Concurring Opinion on Reconsideration En Banc. Chief Justice Frost authored the Dissenting Opinion on Reconsideration En Banc, in which Justice Jewell joined.